**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> GARY LESTER HALL, et al., ) <br> ) <br> Defendants. ) <br> _____) | **CRIMINAL ACTION** <br><br> No. 08-10208-MLB |

**MEMORANDUM AND ORDER**

This case comes before the court on defendants Gary Hall and Sunflower Supply Company, Inc.'s ("Sunflower Supply") motion to suppress evidence and request for a Franks hearing. (Doc. 126). The motion is fully briefed and the court conducted an evidentiary hearing on October 6 and 7, 2009. (Docs. 129, 169). Other defendants have moved to join the motion. (Docs. 139, 140, 141, 152, and 154). For the reasons stated herein, the motions to join are sustained but the motion to suppress is denied.

**I.  PROLOGUE**

In order to be entitled to an evidentiary hearing under Franks v. Delaware, "the defendant must allege deliberate falsehood or reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." United States v. Artez, 389 F.3d 1106, 1116 (10th Cir. 2004) (citing Franks v. Delaware, 438 U.S. 154, 171 (1978)). To support such allegations, a defendant should provide affidavits of witnesses or satisfactorily explain their absence. See id. In addition, a defendant seeking an evidentiary hearing must show that, after the challenged portions of the affidavit are stricken, the

remaining content of the affidavit is not sufficient to support a finding of probable cause. See id.; United States v. Nelson, 450 F.3d 1201, 1213-14 (10th Cir. 2006).

Defendants' motion alleges that ATF Special Agent Wesley Williamson's affidavit contains material false statements and omitted information. (Doc. 129 at 2-3). However, it is not supported by affidavits of witnesses, or an offer of proof; only a conclusory affidavit of defendants' counsel. (Doc. 129-3 at 126-27). Thus the court could have, and probably should have, refused a Franks hearing for this reason. So why was a hearing held? Tenth Circuit cases, citing Franks, require a defendant to make a "substantial preliminary showing" to be entitled to a hearing. But this phrase is undefined and subject to "interpretation" in the event of appellate review which, in a worst case scenario, could result in a reversal after a long and expensive trial. Since a request for a Franks hearing is a motion under Fed. R. Crim. P. 12(b)(3)(C), the decision to hold a hearing was consistent with the goals of Rule 2 and forecloses any claim on appeal that the court erred by not holding a hearing.

**II. BACKGROUND**

**A. The Indictment**

Eleven defendants, three of which are corporate entities, have been charged in an indictment filed on October 15, 2008. The indictment contains a total of 43 counts and a forfeiture allegation and alleges a conspiracy to commit Contraband Cigarette Trafficking Act ("CCTA") record keeping violations, mail fraud, wire fraud, violations of the interstate travel or transportation in aid of racketeering enterprises statute, conspiracy to commit money

laundering, and money laundering from January 2005 through May 7, 2007.

The defendants named and described in the indictment are as follows:

1) Wholesaler Sunflower Supply Company ("Sunflower"), located in Galena, Kansas, is owned by Gary Hall. Sunflower sells and ships premium cigarettes.

2) Sunflower is licensed in Kansas and Oklahoma.

3) Sunflower purchased and affixed Oklahoma tax stamps to each carton of premium cigarettes it sold. The monetary amount of the stamps varied depending on the ultimate destination in Oklahoma where the cigarettes were to be sold.

4) Anthony Grantham is the operations manager for Sunflower and is responsible for its day-to-day activities.

5) Wholesaler Discount Tobacco Warehouse ("DTW"), located in Joplin, Missouri, sells and ships discount cigarettes.

6) Justin Boyes, who at one time was employed by Sunflower, became the sole shareholder and the president of DTW.

7) Like Sunflower, DTW purchased and affixed Oklahoma tax stamps to each carton of discount cigarettes sold.

8) Rebel Industries ("Rebel") is a trucking company that transports both Sunflower's and DTW's cigarettes.

9) James Coble was a former employee of Sunflower who became president of Rebel.

10) Rebel is located at the same address in Galena, Kansas, as Sunflower.

11) Danny Davis is a truck driver employed by Rebel.

12) Keith Noe is the accountant for Sunflower, DTW, and Rebel

13) Justice Berry is another accountant who works under the direction of Noe.

14) Jeremy Hooker owns and manages Pipestone Smoke Shop ("Pipestone") located in Vinita, Oklahoma. Pipestone is leased from the Cherokee tribe and is authorized by Oklahoma to sell cigarettes bearing the lowest 6-cent tax stamp.

**B. Oklahoma's Cigarette Tax System**

It is a gross understatement to say that during 2005-2007, Oklahoma's cigarette taxation system was complicated and complex. Hall and Sunflower have done a particularly good job of explaining it (Doc. 129 at 3-20) and for purposes of this memorandum, the court will largely adopt their explanation.

There are several Native American tribes in Oklahoma. Because the tribes are sovereign nations, Oklahoma cannot collect taxes on cigarettes sold to tribal members at retailers ("smoke shops") located on tribal lands ("Indian Country"). But smoke shops also sell cigarettes to non-tribal members and Oklahoma can collect taxes on those sales. Prior to 2005, Oklahoma and some of the tribes entered into so-called "compacts" which provided for "payment in lieu of taxes" by the tribes for cigarettes sold in smoke shops to non-tribal members. The compacts were intended to, and apparently did for a while, allow compacting tribes to sell cigarettes at prices lower than non-compacting tribes and non-Indian retailers.

On January 1, 2005, Oklahoma eliminated sales tax on cigarettes for <u>all</u> retailers, both Indian and non-Indian, and increased the

-4-

excise tax. Cigarettes were sold at seven different excise tax rates which were dependent upon whether the retailer was a non-tribal retailer, tribal retailer without a compact, or a tribal retailer with a compact.[1] The tax rates were indicated by stamps affixed to cartons and/or packs of cigarettes. Wholesalers like Sunflower that sold to retailers such as those of the Cherokee Nation were responsible for collecting payments in lieu of state taxes. "[T]he wholesaler would advance the payment to the state, affix the appropriate stamps on the cigarette packages, and then pass the cost on to the retailer, depending on that retailer's location." (Doc. 129 at 9). By eliminating the sales tax and increasing the excise tax, many tribal retailers lost their price advantage in cigarette sales because in renewing their expired compacts,[2] several tribes had agreed to pay 100% of any increase in excise taxes on cigarettes after January 1, 2004.[3]

The Cherokee Nation believed that Oklahoma breached their compact by repealing the sales tax. To regain the price advantage, many Cherokee retailers began purchasing cigarettes from other retail stores located along border states such as Kansas that were authorized to sell cigarettes using a lower rate tax stamp, rather than purchasing them from a wholesaler which would be required to affix a higher rate tax stamp. The Cherokee Nation believed this "retail-to-

---

[1] This ranged from $1.03 to $.575 ("6 cents") per pack.

[2] The initial compacts between the State of Oklahoma and several tribes expired after 10 years.

[3] Some tribes negotiated exceptions to requirement that tribal retailers pay 100% of any excise tax increase, which established the "exception rate" Kansas border and Arkansas border rate stamps.

retail sale" system was consistent with the compact. As a result of these retail-to-retail sales, Oklahoma did not generate as much revenue from cigarette sales because non-exception rate retailers were selling cigarettes to their customers with lower exception rate tax stamps.

The Cherokee Nation, which imposed and collected its own sales taxes on cigarettes sold at Cherokee smoke shops, was also losing tax revenue from retail-to-retail sales. As a result, the Nation began requiring its retailers to submit monthly reports of retail-to-retail sales and instituted a $1.50 per carton "surcharge" on such sales. The Nation nevertheless allowed its retailers to continue retail-to-retail sales of cigarettes because it believed that Oklahoma had breached the compact.

On the other hand, the Oklahoma Tax Commission ("OTC") did not believe that retail-to-retail sales were consistent with the compact and considered the Cherokee Nation's actions to be a breach. However, because of sovereign immunity, the OTC did not have jurisdiction to collect taxes or enforce the compacts on tribal lands. As more fully detailed in Sunflower's memorandum and testified to at length by witnesses at the hearing, the OTC initially sought the assistance of ATF, which looked into the matter as more fully set forth in section C. In addition, as a reader unfamiliar with the situation no doubt would be shocked to learn, there was litigation. The OTC went after Sunflower in an administrative action seeking revocation of Sunflower's Oklahoma license and recovery of underpaid stamp fees claiming that Sunflower was selling cigarettes to tribes using the incorrect (i.e. lower) tax stamp. Sunflower responded by suing the

OTC in Oklahoma state court where it obtained a TRO. Ultimately a settlement was reached. Cherokee retailers also sued the OTC in Oklahoma state court, which stayed the case pending arbitration. Arbitration was ultimately concluded in March 2008. In November 2008, Oklahoma and the Cherokees then entered into a new compact which, among other things, prohibited retail-to-retail sales.

### C. ATF Investigation

Agent Williamson's involvement with the investigation of Sunflower and Hall began on May 8, 2006, when he was called by Kansas Department of Revenue Agent Fletcher Hill after a U-Haul truck driven by Davis was seized in Coffeyville, Kansas. The U-Haul was loaded with cigarettes stamped with Missouri, Oklahoma, and Oklahoma tribal tax stamps. Agent Williamson contacted Ms. Burkhalter at the OTC and learned that the stamps on the seized cigarettes were to be sold by tribal 6-cent exception rate smoke shops. The smoke shop in Harrah where Davis originally said the cigarettes had come from was not authorized to sell the 6-cent exception rate stamps.

Agent Williamson began investigating Davis. Davis' insurance card listed Davis as an employee of Sunflower. Davis also had Grantham's business card and a piece of paper with defendant Boyes's home phone number, which were seized from Davis at the stop. Agent Williamson obtained the U-Haul rental agreement which listed Davis' name as "Danny Hayes" and provided an Oklahoma address.[4]

Agent Williamson also learned that Davis was an employee of

---

[4]The record shows that Davis apparently signed the U-Haul receipt "Danny Davis". Agent Williamson testified that he could not tell by the signature how Davis signed his name.

-7-

National Tobacco Distributors ("NTD"). NTD ran an Absentee Shawnee Tribe smoke shop in Harrah, Oklahoma. Hall had signed the original lease and license to this smoke shop in May of 2001. Agent Williamson believed that Sunflower was funneling cigarettes to retail smoke shops in Oklahoma because Hall either owned or was involved in several of these entities. The Shawnee smoke shop was not eligible to sell cigarettes stamped with the exception rate tax, but they were being sold there. Noe, the comptroller or accountant for Sunflower Supply, had also signed checks for Rebel, NTD, and Boyes d/b/a Discount Tobacco Warehouse.

During his investigation, Agent Williamson talked with ATF agent Josh Patree, who worked in the Tulsa, Oklahoma office,[5] and Agent Patree's supervisor about the different tax rates that came about after the 2005 cigarette tax changes went into effect. They discussed the ways in which several retailers were believed to be circumventing the law.[6]

Agent Williamson established surveillance on Sunflower. He observed Davis leaving Sunflower and followed him to a residence in Galena.[7] Agent Williamson knocked on the door and asked an unknown man for Davis. Davis came to the door and Agent Williamson asked him for his phone number. Davis provided (405) 818-7686, which was one

---

[5]Tulsa is a field office and reports back to the division office in Dallas, Texas. The Dallas office reports back to Washington D.C.

[6]Agent Williamson testified that First American, Rebel, Sunflower, DTW, Pipestone, and the Two Turtles shops were retailers that he discussed with Agent Patree.

[7]Rebel has its offices at the same address as Sunflower so it is questionable as to which entity Davis was leaving from.

digit off from the phone number listed on the U-Haul receipt. Agent Williamson believed that Davis provided false information to U-Haul because the name, phone number, and address on the rental agreement were different then Davis' actual address and information.

In June of 2006, Agent Williamson went to Coffeyville and looked at the seized cigarettes. He observed that each box contained approximately 30 cartons and were either marked with Pipestone and a number and DTW or the cigarettes were stacked and wrapped in plastic with labels marked "Pipestone." Ms. Burkhalter told Agent Williamson that there was only one Pipestone and that it was a 6-cent exception rate smoke shop. Agent Williamson testified that Pipestone was not a large shop and could not have handled the number of cigarettes stamped with the 6-cent tax rate being delivered there.

On June 5, 2006, Agent Williamson purchased cigarettes at Pipestone. He spoke to the Pipestone employees, but did not identify himself as an ATF agent. Agent Williamson testified that he used a "ruse" and told the employees that he was running a payday loan business and he was interested in putting a payday loan in Pipestone. He asked about the number of people who came in. Agent Williamson further testified that the employees were straightforward and answered all of his questions. In fact, they "boasted" about selling 1,850,000 cartons of cigarettes before he even told him about the payday loan business. The employees also said that most of the cigarettes were sold to other shops near Tulsa, Oklahoma. The Pipestone clerk gave Agent Williamson Hooker's name and telephone number and told Agent Williamson that Hooker was the owner.

Additionally, Agent Williamson purchased cigarettes at First

American Tobacco Company and several Two Turtles smoke shops in different locations. Agent Williamson did not speak to the First American or Two Turtles employees about the cigarettes or the stamps on the cartons. Nor did he talk with First American or Two Turtles' owners about where the cigarettes came from. Agent Williamson checked the tax stamps on cartons he purchased and discovered that the stamps were sold to either Sunflower or DTW.

Agent Williamson also conducted a review of the Tulsa World newspaper articles. According to an article dated December 4, 2005, Hooker was very open about retail-to-retail sales. (Government exh. 4, p. 4).[8] Agent Williamson did not attach a copy of the December 4 article to his 40 page, 187 paragraph affidavit. The only portion of the article Agent Williamson referenced in his affidavit was the quote from Hooker stating, "his store has sold an estimated 1.2 million cartons of cigarettes this year" compared to 35,000 cartons last year. Agent Williamson never attempted to interview Hooker or get his input on the illegality of retail-to-retail sales prior to May 2007. He did not contact the Nation to see if Hooker held the license to Pipestone and never spoke with or attempted to speak with Cherokee Chief Chad Smith.[9]

Agent Williamson referenced another article that reported that employees of Creek smoke shops were asked to shred documents and lock

---

[8]Omer Gillham, <u>Tribal Smoke Shop's Sales on Fire</u>, Tulsa World, Dec. 4, 2005.

[9]Chief Smith stated that "Pipestone and other Cherokee smoke shops are making huge profits from the nation's decision not to enforce a tribal statute that prohibits store-to-store sales." (Defendants' exh. 13, p. 2).

-10-

the doors if OTC employees came to the stores. (Government exh. 4, p. 1).[10] His affidavit does not mention other portions from this same article that the Tobacco Retailers Alliance believe retail-to-retail sales are legal under Oklahoma law. Nor did Agent Williamson include statements made by Hall that Sunflower Supply is in compliance with Oklahoma law. Agent Williamson did not contact the people involved in the Creek smoke shops prior to May 1, 2007. Additionally, he never spoke with or attempted to speak with Hall or the Tobacco Retailers Alliance. Agent Williamson did mention that OTC has no jurisdiction on tribal land, but did not reiterate this fact in paragraph 16 when he stated that Creek employees were supposed to lock out the OTC.

Agent Williamson did not receive any documents from or attempt to contact the Cherokee Nation prior to obtaining the search warrant. He did not include Diane Hammon's, general counsel for the Cherokee Nation,[11] statements that Nation allowed retail-to-retail sales to happen because the Nation did not get what it bargained for out of their compact with Oklahoma.

The OTC provided Agent Williamson with documents which included the district court case and administrative action against Sunflower Supply. However, Agent Williamson did not list in detail the disagreement between the Cherokee and Creek Nations and the OTC regarding retail-to-retail sales and whether it violated Oklahoma law. Nor did Agent Williamson state in his affidavit that the district

---

[10] Omer Gillham, Workers Say Smokes Shuffled, Tulsa World, Nov. 6, 2005.

[11] Ms. Hammon is currently the Attorney General for the Cherokee Nation.

-11-

court allowed retail-to-retail sales among tribal retailers to continue while the case was stayed for arbitration. Agent Williamson testified that he did not put this in his affidavit because he was investigating Pipestone's sales, not retail-to-retail sales generally.[12]

Approximately three or four days prior to May 1, 2007, Agent Williamson's affidavit was provided to a Kansas magistrate and Missouri magistrate for review. Agent Williamson sought search warrants for Sunflower and DTW. The magistrates signed the search warrants on May 1. Both warrants were executed on May 8.

**D. Government's Claims**

The government's claims are premised on a theory that defendants, in various ways, took advantage of and profited from, Oklahoma's method of taxing cigarette sales within its borders which depended on whether the cigarettes were being sold by Native American tribes or by others. The government further charges that defendants conspired to traffic contraband cigarettes by developing the following scheme: Sunflower and DTW would receive and fill cigarette orders from various Oklahoma smoke shops and/or Pipestone. Sunflower and DTW coded each smoke shop as Pipestone with a designated number in their records (e.g. Pipestone #4). Sunflower and DTW would pre-pay and affix the lower-rate Oklahoma tax stamps on each carton of cigarettes. Rebel would load the cigarettes and transport them to Pipestone smoke

---

[12]Agent Williamson testified at the hearing that Pipestone's sales to other retailers would have been relevant to his investigation, but he did not reference the district court's order in his affidavit.

-12-

shop.[13] Then the smoke shops that made the initial orders would transport their cigarettes bearing the lower-rate tax stamps from Pipestone to their own stores, which were not licensed to sell low tax-rate cigarettes. These smoke shops ultimately sold the cigarettes bearing the lower-tax stamp to the consumers, collected the excise tax, and reported the tax to the OTC. As a result, the State of Oklahoma did not collect its expected tax revenue from cigarette sales within its borders.

The government further charges that defendants filed false reports with Kansas Department of Revenue that concealed defendants' scheme. Defendants allegedly knew that the cigarettes were being diverted to higher tax-rate retailers after being delivered to Pipestone. The government contends that defendants falsified reports when they reported that cigarettes were sold to Pipestone knowing full well that they were being sold by other retail smoke shops that were not authorized to sell cigarettes bearing lower tax-rate stamps.

**III. ANALYSIS**

Defendants claim that Agent Williamson recklessly or intentionally omitted material facts in his probable cause affidavit to the magistrates and had the magistrates known these facts, they would not have issued the search warrants.

The parties are well aware of the standards announced in Franks v. Delaware, 438 U.S. 154, 171-2 (1978).

> "Under Franks, a hearing on the veracity of the affidavit supporting a warrant is required if the defendant makes

---

[13]Initially, Rebel would transport the cigarettes to each smoke shop, but later delivered all cigarettes coded Pipestone with a designated number at the original Pipestone.

-13-

> a substantial showing that the affidavit contains intentional or reckless false statements and if the affidavit, purged of its falsities, would not be sufficient to support a finding of probable cause." (Citations omitted). "The standards of deliberate falsehood and reckless disregard set forth in <u>Franks</u> apply to material omissions, as well as affirmative falsehoods." (Citations omitted). If, after considering the evidence presented at a <u>Franks</u> hearing, the district court concludes by a preponderance of the evidence that the affidavit contains "intentional or reckless false statements," (citations omitted), or "material omissions," (citations omitted), "then the district court must suppress the evidence obtained pursuant to the warrant." (Citations omitted). If, however, the district court concludes that the omitted information would not have altered the magistrate judge's decision to authorize the search, then the fruits of the challenged search need not be suppressed. (Citations omitted).

<u>United States v. Avery</u>, 295 F.3d 1158, 1166-67 (10th Cir. 2002). The defendants must show that the Agent Williamson made intentional or reckless omissions as opposed to omissions negligently made or by innocent mistake. <u>Artez</u>, 389 F.3d at 1116.

Defendants claim that Agent Williamson's affidavit contains material false statements and omitted information in two areas: the alleged criminality of the retail-to-retail sales (Doc. 129 at 21-24) and the Wholesalers' role in the retail-to-retail sales (<u>id.</u> at 24-32). The court has carefully reviewed defendants' memo and finds only one claim of falsity: that wholesalers are subject to Jenkins Act reporting requirements (<u>id.</u> at 28-29). Paragraph 17 of Williamson's affidavit is said to claim this falsity.

It does appear that Agent Williamson <u>misinterpreted</u> the Jenkins Act to require distributors to file monthly reports.[14] However, the

---

[14]The Jenkins Act provides: "[a]ny person who sells or transfers for profit cigarettes in interstate commerce, whereby such cigarettes are shipped into a State taxing the sale or use of cigarettes, to other than a distributor licensed by or located in such State, or who

-14-

court finds that Agent Williamson's misinterpretation was an innocent mistake, which does not satisfy the Franks standards. Artez, 389 F.3d at 1116. Agent Williamson testified that this case is his first cigarette investigation and further that he believed the Jenkins Act did apply in this situation. More importantly, one inaccurate paragraph due to Agent Williamson's misinterpretation of the Jenkins Act does not overshadow the remaining 186 paragraphs such that there is insufficient probable cause to support the search warrant. But more to the point, something which defendants claim Agent Williamson "should have known" about the legal requirements in a statute (id. at 29) is not evidence of falsity.

The remainder of defendants' argument centers around information that Agent Williamson omitted from his affidavit. (Defendants variously use terms like "omitted," "misleading," "failed to acknowledge," "incomplete," "far from complete," "failed to mention," "failed to explain" and "failed to disclose.") For example, defendants argue that the affidavit does not mention the TRO granted in the Oklahoma case which eventually settled after arbitration. Defendants claim that by entering a TRO, the Oklahoma state judge "implicitly approved" retail-to-retail sales by the Cherokee (id. at 22). A TRO maintains the status quo; it does not signal a court's "implicit approval." Defendants cite no case to support this interpretation. Defendants point out that the affidavit "omits"

---

advertises or offers cigarettes for such a sale or transfer and shipment[.]" 15 U.S.C. § 376(a).

mention of the Cherokee Nation Tax Commission's "legitimization" of retail-to-retail sales by taxing them rather than prohibiting them. Defendants do not explain, however, how this omission was material or how it would have changed the magistrates' decisions to issue the warrants.

Defendants next assert that the affidavit fails to mention the ATF's 2005 investigation. There was a lot of testimony at the hearing about the investigation but there was no evidence that Agent Williamson was involved or, for that matter, knew about it. Perhaps most important, there is no evidence that ATF's investigator made findings or reached conclusions that the violations set forth in the indictment are false or groundless.

Finally, defendants claim that Agent Williamson omitted information from articles appearing in Oklahoma newspapers. The court is frankly amazed by this claim, which smacks of desperation. The affidavit mentions newspaper articles in only three paragraphs (16, 57 and 58). Defendants do not claim that Agent Williamson's references in the paragraphs are false, only that they are incomplete or omit reference to other articles. They do not explain, as is their burden, how these failures are material or how, if the information had been included, the magistrates would have refused to issued the warrants. The court can but imagine the protests which defendants would have raised to an affidavit supported mainly by references to newspaper articles!

Turning to defendants' arguments regarding the wholesalers' role in the retail-to-retail sales, they attack the "Financial Analysis" section of the affidavit (paras. 155-171) <u>not on the basis of falsity</u>

<u>or inaccuracy</u>, but rather that Hall was engaged in "innocent business ventures unrelated to Sunflower Supply Company that would have accounted for all of the listed financial transactions ... information which was readily available to any ATF agent ...." (Doc. 129 at 26). Come on, now. The conclusion Agent Williamson reached from the "Financial Analysis" was that Hall "is an owner or at least exercises some control over Sunflower Supply Company, Discount Tobacco Warehouse (DTW) and Rebel Industries." (Affidavit, para. 171). Defendants do not claim that this conclusion is incorrect or that it would be different had Agent Williamson considered the things "any ATF agent" would have known.

Defendants assert that Agent Williamson's reference to the OTC's action against Sunflower was "far from complete." (Affidavit, paras. 27-29). Defendants argue that Agent Williamson did not mention that the OTC abandoned an initial fraud claim and that ultimately the case settled for only a small percentage of the deficiency originally claimed. Defendants' views regarding how these omissions were material or how they would have affected the magistrate judges' decisions will forever remain a mystery.

Finally, defendants challenge a portion of the single paragraph of the affidavit (para. 34) in which Agent Williamson states his "belief" that Davis had rented numerous U-Haul trucks in Joplin, Missouri. At the hearing, defendants examined Agent Williamson about his allegations that Davis had provided false information to U-Haul when he signed the agreement "Danny Davis" and the phone number was only off by one digit. Defendants pointed out that these mistakes might have been clerical errors and Agent Williamson did not verify

one way or another. Agent Williamson responded that only two possible people could have made the mistake and because the name, address, and phone number appear to be inaccurate, Agent Williamson assumed that the errors were made Davis.

Defendants also point out that Agent Williamson's statement in paragraph 34 that "EA Hill relayed that he had checked with the rental company and that it was believed that Davis had rented numerous trucks form the U-Haul Center located at 2521 East 7th, Joplin, Missouri 64801[ ]" (Defendants' exh. 2 at 14) was inaccurate based on U-Haul's receipts. U-Haul's records showed that a Danny Hayes rented trucks from the U-Haul center in Midwest City, Oklahoma 21 out of 22 times. (Defendants' exh. 18). Agent Williamson testified that his purpose for paragraph 34 was to demonstrate his belief that the April 28 stop was not the first time that Davis was trafficking contraband cigarettes into Oklahoma.

Defendants have not proven one way or another that Davis gave false information to U-Haul or that it was entered into its computer incorrectly. Nor have defendants shown that Agent Williamson had the 22 U-Haul receipts in his possession at the time he drafted his affidavit since he noted that "EA Hill relayed that <u>he</u> had checked ...." Even if Agent Williamson was wrong about Davis giving false information or had the records showing that Davis had rented U-Hauls from Midwest City instead of Joplin, defendants have not shown that Agent Williamson's mistakes were intentionally or recklessly made.

**IV. CONCLUSION**

Defendants have not shown that Agent Williamson intentionally or recklessly submitted false or misleading information in his

-18-

affidavit for search warrants to the magistrates.  Nor have defendants shown any omitted fact to be material to the Kansas investigation of Sunflower and Hall.  After having their requested hearing, defendants have not demonstrated how the striking of any or all of the objected-to paragraphs in the affidavit would render the affidavit <u>in</u>sufficient to support a finding of probable cause.

The court concludes that any inaccurate information supplied by Agent Williamson was, <u>at most</u>, an innocent mistake.  Defendants have not met their burden under <u>Franks</u> and their motion to suppress (Doc. 126) is denied.

IT IS SO ORDERED.

Dated this <u> 11th </u> day of January 2010, at Wichita, Kansas.

s/ Monti Belot<br>
Monti L. Belot<br>
UNITED STATES DISTRICT JUDGE