# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No. 08-10208-MLB |
| | ) | |
| GARY LESTER HALL, ET AL., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM AND ORDER

This case comes before the court on defendants Gary Hall, Sunflower Supply ("Sunflower"), Justin Boyes, Discount Tobacco Warehouse ("DTW"), Keith Noe, and Jeremy Hooker's post-<u>James</u> hearing motions in opposition to the introduction of hearsay statements of alleged coconspirators.

On July 15, 2009, defendants filed and/or joined motions to identify and determine admissibility of coconspirator hearsay statements. (Doc. 127). On November 5 and 6, 2009, the court held a <u>James</u> hearing to determine the pretrial admissibility of such statements under Federal Rule of Evidence 801(d)(2)(E). Following the hearing, the court asked the parties to supplement briefs. The court has received the parties' supplemental memoranda and is now prepared to rule. (Docs. 250, 251, 262, 273, 290, 292, 294, 295, 301, 306). For the reasons stated herein, defendants' motions are granted in part and denied in part.[1]

---

[1] By Memorandum and Order of April 12, 2010, (Doc. 314) the court found that the government had failed to show that defendants James Coble, Rebel Industries, and Justice Michael Berry were members of the two alleged conspiracies.

II.    **BACKGROUND**

   **A. The Indictment**

   Ten defendants, three of which are corporate entities, have been charged in an indictment filed on October 15, 2008. The indictment contains a total of 43 counts and a forfeiture allegation and alleges two conspiracies: one to commit Contraband Cigarette Trafficking Act record keeping violations and another to commit money laundering. The indictment also alleges substantive counts of mail fraud, wire fraud, violations of the interstate travel or transportation in aid of racketeering enterprises statute and money laundering, each which is tied back to the conspiracy counts. The relevant dates for all counts are from January 2005 through May 7, 2007.[2]

   The defendants named and described in the indictment are as follows:

   1)  Wholesaler Sunflower is located in Galena, Kansas. Sunflower sells and ships premium cigarettes. Sunflower is licensed in Kansas and Oklahoma. Sunflower purchased and affixed Oklahoma tax stamps to each carton of premium cigarettes it sold.

   2)  Gary Hall owns Sunflower and was responsible for forming

_____

   [2] Count 1 charging conspiracy to divert cigarettes alleges, in paragraphs 29-35, that in 2002 and 2003, defendants Gary Hall, Tony Grantham, Keith Noe and others created a scheme to conceal sales of discount cigarettes form major cigarette manufacturers Phillip Morris and R.J. Reynolds. DTW supposedly was created in furtherance of this concealment. (Doc. 255, pp. 19 et seq.). Such concealment may, or may not, have taken place. If it did, it may, or may not, have breached certain agreements between defendants and the manufacturers. However, it is not alleged to have violated any laws.

DTW and Rebel Industries ("Rebel"). Hall also owned Shawnee Tobacco Smoke Shop located in Oklahoma.

3) Anthony Grantham is the operations manager for Sunflower and is responsible for its day-to-day activities.

4) Wholesaler DTW, located in Joplin, Missouri, sells and ships discount cigarettes. Like Sunflower, DTW purchased and affixed Oklahoma tax stamps to each carton of discount cigarettes sold.

5) Justin Boyes, who at one time was employed by Sunflower, became the sole shareholder and the president of DTW.

6) Rebel is a trucking company that transports both Sunflower's and DTW's cigarettes. Rebel is located at the same address in Galena, Kansas, as Sunflower.

7) James Coble was a former employee of Sunflower who became president of Rebel.

8) Danny Davis was a truck driver employed by Rebel.[3]

9) Keith Noe is the accountant for Sunflower, DTW, and Rebel

10) Justice Berry is another accountant who works under the direction of Noe.

11) Jeremy Hooker owns and manages Pipestone Smoke Shop ("Pipestone") located in Vinita, Oklahoma. Pipestone is leased from the Cherokee tribe.

## B. Government's Claims

The government's claims are premised on an underlying theory that defendants, in various ways, conspired to take advantage of and

---

[3] On January 13, 2010, the indictment against Danny Davis was dismissed without prejudice. (Doc. 247).

to profit from Oklahoma's complicated method of collecting taxes on cigarette sales within its borders. The amount of tax depended on whether the cigarettes were being sold by Native American tribes at "smoke shops" or by non-Indian retail outlets which did not benefit from the tax advantages enjoyed by the tribes. Beginning in 2005, cigarettes were sold at seven different excise tax rates which were dependent upon whether the retailer was a non-tribal retailer, tribal retailer without a compact, or a tribal retailer with a compact.[4] The tax rates were indicated by stamps affixed by wholesalers to cartons and/or packs of cigarettes.

Wholesalers Sunflower and DTW received and filled cigarette orders from various Oklahoma smoke shops including Pipestone Smoke Shop located in Vinita, Oklahoma. Pipestone was authorized to sell cigarettes bearing 6-cent tax stamps but some of the other smoke shops were located in high stamp areas. One in particular, Shawnee Tobacco Smoke Shop, owned by Gary Hall, was in a 77-cent tax rate area. Persons who wished to ruin their health by smoking cigarettes could do so more quickly and cheaply by buying from a smoke shop selling 6-cent tax rate cigarettes. Owners of smoke shops stood to make a lot more money selling 6-cent tax rate cigarettes than 77-cent cigarettes. That is the American way, after all.

After Sunflower and DTW pre-paid and affixed the lower-rate Oklahoma tax stamps on each pack or carton of cigarettes, Rebel loaded the cigarettes and transported them to Pipestone. At one point, Rebel also transported the cigarettes to other smoke shops. Later, Rebel

---

[4] This ranged from $1.03 to $.0575 ("6 cents") per pack.

delivered all cigarettes only to Pipestone. The other smoke shops transported or as alleged by the government, "diverted" cigarettes bearing the lower-rate tax stamps from Pipestone to their own stores, which were not licensed to sell low tax-rate cigarettes, but did so nevertheless. Sunflower and DTW's purpose for the alleged diversion scheme was to maintain the level of customers and profit as it was prior to the Oklahoma tax change in 2005. (Doc. 255 at 42). As a result, the State of Oklahoma did not collect its expected tax revenue from cigarette sales within its borders and tribes did not get their expected rebates.

So how did defendants accomplish the alleged conspiracy to divert low-tax rate cigarettes to high-tax rate stores? The government charges that defendants filed false reports with Kansas Department of Revenue that concealed the diversion scheme.[5] Copies of the supposedly false Kansas reports were sent to and/or shared with Oklahoma and Missouri. Because Oklahoma taxing authorities saw only Pipestone's Vinita address on the Kansas reports, the reports allegedly concealed that smoke shops in the high-tax areas were selling the low-tax cigarettes. (Doc. 255 at 64).

Based on hours of testimony, scores of exhibits and lengthy memoranda, the court can glean at least some of defendants' positions

---

[5] At the James hearing, IRS-CI Special Agent Tonya Martin admitted that no other Kansas tax laws were violated. (Doc. 258 at 29). As discussed elsewhere, the court is not persuaded by Agent Martin's testimony that the Kansas tax reports were false. This might make the uninitiated wonder why this case is proceeding in Kansas. The answer is that Danny Davis, a former defendant, was caught in Kansas with a load of allegedly contraband Oklahoma-stamped cigarettes. All of that was the subject of the Franks hearing and is not particularly relevant to the James issues.

with respect to the charges. Defendants say they did not file false reports because 6-cent cigarettes were, in fact, properly stamped and delivered to Pipestone. This appears to be true. Defendants argue that there was nothing secret or illegal about the fact that cigarettes were shipped on from Pipestone to other smoke shops. They say that the alleged "diversion" was simply lawful "retail-to-retail" sales of cigarettes between smoke shops authorized by the Cherokee Nation and other tribes, the facts about which were well-publicized in Oklahoma. That is true, too. Defendants' collective overall position perhaps may be summarized in Boyes' counsel's statement at the hearing: "What our position is is there's not a conspiracy. Our clients were part of an industry-wide response to a legal and political situation in Oklahoma that was incredibly complicated; and the acts that the Government says are acts of co-conspirators are in fact a business - an industry response to the changes in the laws." (Doc. 257 at 2-3).

A jury may well agree with this statement. The court admits that this is a "close case." The conspiracy allegations of the indictment do not stand out as overtly illegal. Indeed, viewed individually, most allege legal activities, as contrasted with the more typical illegal drug conspiracy. The individual defendants are businessmen with no criminal records. The corporate defendants are just that - corporations. Add to this the evidence regarding Oklahoma's complex cigarette tax scheme and "retail-to-retail" sales controversy. Nevertheless, the parties should keep in mind that the issue here is narrow: admissibility of coconspirator hearsay statements. It is not the trial. The evidence has been received under the liberal standards

of Fed. R. Evid. 104(a). Finally, the government's burden is only by a preponderance of evidence, not beyond a reasonable doubt. Having said this, the court is not inviting further evidence, briefing or argument. Everyone has had his day in court on this aspect of the case.

## III. ANALYSIS

### Fed. R. Evid. 801(d)(2)(E)

Out-of-court statements made by coconspirators are non-hearsay and admissible evidence under Fed. R. Evid. 801(d)(2)(E).[6] <u>United States v. Owens</u>, 70 F.3d 1118, 1123 (10th Cir. 1995). "Before admitting evidence under this rule, 'The court must determine that (1) by a preponderance of the evidence,[7] a conspiracy existed, (2) the declarant and the defendant were both members of the conspiracy, and (3) the statements were made in the course of and in furtherance of the conspiracy.'" <u>Id.</u> In determining whether Rule 801(d)(2)(E) is met, the court may rely on the coconspirator statements themselves, but the government must produce some "independent evidence" that a conspiracy existed.

---

[6] Fed. R. Evid. 801(d)(2)(E) provides: "A statement is not hearsay if ... [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy."

[7] In the present situation, preponderance of evidence is evidence sufficient to persuade the court that a fact is more likely present than not present. Tenth Circuit Pattern Criminal Federal Jury Instruction 1.05.1. The court may also find reasonable inferences from the evidence that are sufficient to show the existence of a conspiracy. <u>United States v. Aldershof</u>, Nos. 07-10034-01-WEB, 07-10034-02-WEB, 07-10034-03-WEB, 07-10034-04-WEB, 2007 WL 2571646, at *3-4 (D. Kan. Aug. 31, 2007).

### Conspiracy

First, the court must determine whether a conspiracy existed.

> To prove conspiracy, the government must show: (1) that two or more people agreed to violate the law, (2) that the defendant knew at least the essential objectives of the conspiracy, (3) that the defendant knowingly and voluntarily became a part of it, and (4) that the alleged co-conspirators were interdependent. (Citations omitted). "[A] single conspiracy does not exist solely because many individuals deal with a common central player." (Citations omitted). "What is required is a shared, single criminal objective, not just similar or parallel objectives between similarly situated people." (Citations omitted). On the other hand, "[a] defendant need not have knowledge of all the details or all the members of the conspiracy and may play only a minor role in the conspiracy." (Citations omitted). The government need only prove by direct or circumstantial evidence "that the defendant knew at least the essential objectives of the conspiracy, and the defendant knowingly and voluntarily became part of it." (Citations omitted).

United States v. Small, 423 F.3d 1164, 1182-83 (10th Cir. 2005). Proof of interdependence depends heavily on the specific facts of each case. United States v. Cestnik, No. 93-8063, 1994 WL 201110, at *4 (10th Cir. May 17, 1994). Further, "a conspiracy conviction requires 'at least the degree of criminal intent necessary for the substantive offense itself.'" United States v. Wittig, 575 F.3d 1085, 1099 n.2 (10th Cir. 2009). A conspiracy can still exist even if some of the acts that contribute to the unlawful goal of the conspiracy are legal. See generally Salinas v. United States, 522 U.S. 52, 63-64 (1997) ("The partners in the criminal plan must agree to pursue the same criminal objective and may divide up the work, yet each is responsible for the acts of each other."); United States v. Fox, 902 F.2d 1508, 1519 (10th Cir. 1990) ("The gist of the offense is a combination or agreement to disobey, or to disregard, the law."). Circumstantial evidence can be sufficient to support the government's burden of

proof, e.g. the element of interdependence.  <u>United States v.</u>
<u>Caldwell</u>, 589 F.3d 1323, 1329 (10th Cir. 2009).

**CCTA**

Count 1, paragraph 17, alleges that part of the conspiracy
involved the making of false statements in violation of the Contraband
Cigarette Trafficking Act ("CCTA").  Counts 2-7 allege substantive
violations of the CCTA.  The government claims that defendants failed
to maintain the required records relevant to the six invoices detailed
in Counts 2-7 of the Indictment.  The dates on the invoices range from
June 20 to August 10, 2005.

The CCTA makes it unlawful for any person "knowingly to ship,
transport, receive, possess, sell, distribute, or purchase contraband
cigarettes or contraband smokeless tobacco." 18 U.S.C. § 2342(a).  It
is also unlawful for any person to make false statements or
representation with respect to the recordkeeping and reporting
requirements pursuant to 18 U.S.C. § 2343 and 27 C.F.R. §§ 646.146,
545.147.  <u>Id.</u> § 2342(b).

> The Act [before March 2006] define[d] "contraband
> cigarettes" as [60,000] or more cigarettes that "bear no
> evidence of the payment of applicable State or local
> cigarette taxes ... if the State ... requires a stamp ...
> to be placed on packages or other containers of cigarettes
> to evidence payment of cigarette taxes...." 18 U.S.C. §
> 2341(2). <u>Application of the CCTA thus turns on the relevant</u>
> <u>State or local cigarette tax laws</u>.

<u>United States v. Wilbur</u>, No. CR09-191 MJP, 2010 WL 519735, at *2 (W.D.
Wash. Feb. 4, 2010) (emphasis added).

Other than now-dismissed Count 32, which charged only Danny Davis
with transportation of contraband cigarettes, the court does not find
the term "contraband cigarettes" used in any of the numerous charges

-9-

against defendants. Defendants are not charged with conspiracy to sell or deliver contraband cigarettes in violation of 18 U.S.C. § 2342(a). Defendants are charged only under the recordkeeping part of the CCTA, 18 U.S.C. §§ 2343(b), 2344(b), (2).

The court has reviewed the transcripts and evidence submitted at the <u>James</u> hearing and does not find sufficient evidence that any defendant intentionally and knowingly failed to keep the appropriate records required by the CCTA. The Kansas cigarette reports require the wholesaler to report the number of cigarettes <u>sold</u> and the "sold to" name and address. (<u>James</u> hearing, Gov't exhs. 37, 38) Nowhere on the report does it require the wholesaler to report the "ultimate destination" of the cigarettes. The "ultimate destination" of the cigarettes is not required under 18 U.S.C. § 2343(a) or any applicable regulation, <u>see</u> 27 C.F.R. § 646.147. The court will not read "ultimate destination" into the statute and regulation merely because Agent Martin would like it to be interpreted that way. Agent Martin could not point to any rule or regulation stating that "sold to" means "ultimate destination" of the cigarettes. Nor do the instructions relating to the forms or the Kansas statute pertaining to records, K.S.A. 79-3316. (Noe exhs. 1, 2). While Agent Martin <u>believes</u> the Kansas reports require the ultimate destination (i.e. which would show the "diversion") she has no <u>evidence</u> that they do. See Doc. 258 p. 9 et seq.

The court finds that the government has failed to show by a preponderance of evidence that defendants made false and fraudulent reports to the State of Kansas in order to conceal the alleged cigarette diversion scheme. Defendants reported that Sunflower and

-10-

DTW sold to Pipestone in Vinita. Sunflower and DTW did in fact, sell to, send invoices to, and receive payments from Pipestone in Vinita, which was accurately reflected in their Kansas cigarette reports. Oklahoma used the Kansas reports and did not require anything more than Kansas. Therefore, the court finds that the government has not shown by preponderance of evidence that defendants conspired to violate the CCTA.

## Mail Fraud

Count 1, paragraph 18, alleges that the conspiracy to divert involved mail fraud because the Kansas cigarette sales reports just mentioned were mailed to Kansas officials. The paragraph specifically alleges that the "forms concealed the fraud scheme." Paragraph 43 alleges that the sales reports falsely "concealed the true destination of cigarettes transported to various retail locations throughout Oklahoma ...." Substantive Counts 8 through 17 set out various reports sent by Sunflower and DTW during 2005, 2006, and 2007.

Although the reports themselves contained no false or fraudulent representations of existing facts, affirmative misrepresentations are not required to establish a scheme to defraud. Unites States v. Cronic, 900 F.2d 1511, 1513 (10th Cir. 1990). A scheme to defraud focuses on the intended result of the defendant's conduct. Id.; see also United States v. Haber, 251 F.3d 881, 888 (10th Cir. 2001) and Tenth Circuit Pattern Instruction 2.56. Therefore, the fact that sales reports do not contain false information, in and of itself, is not fatal to the conspiracy to commit mail fraud.

## Wire Fraud

Count 1, paragraph 19, alleges that the conspiracy to divert

involved wire fraud because wire communications were used by Sunflower to order cigarettes from manufacturers, from retailers to order cigarettes from Sunflower and to transfer funds derived from the sale and distribution of cigarettes from Pipestone to Sunflower. Substantive Counts 18-24 set out various such orders which took place in 2005, 2006, and 2007. The court can identify only one exhibit, Tab 25, a fax sheet apparently pertaining to an order from Willy and Billy's Tobacco Shack to Pipestone in June 2006. The other orders may be in the record somewhere but they are not identified in the government's exhibit list. Nevertheless, because evidence that many such orders occurred is not in dispute, the court will assume they occurred as alleged.

Count 25 alleges that in January 2006, Hooker wired money from Pipestone to Sunflower by way of an account at Mayes Credit Union. Once again, the court cannot locate specific evidence of the wire transfer document itself but because the occurrence is not disputed, the court finds that it took place based upon the government's evidence pertaining to Tab 42.

The Tenth Circuit law pertaining to wire fraud is the same as mail fraud. <u>See</u> Tenth Circuit Pattern Instruction 2.57 Comment and Use Note.

### Money Laundering/Racketeering

Count 1, paragraphs 20-23, allege that the conspiracy to divert involved various acts of money laundering and interstate racketeering. Substantive Counts 26 through 31 allege various interstate payments to Sunflower from smoke shops during 2005. Count 33 alleges a second conspiracy to commit money laundering and substantive Counts 34

through 43 allege various monetary transactions pertaining to the purchase of cigarettes, automobiles and payments relating to an aircraft owned by one of Hall's corporations.

Money laundering is a complex subject. The government offered some evidence of money laundering, primarily through Agent Martin's testimony pertaining to the power-point presentation. Three of the individual defendants do not specifically address the money laundering aspects of the evidence in their memoranda. (Hall and Sunflower, Doc. 262; Grantham, Doc. 250; and Boyes, Doc. 273). Noe merely argues that if the government cannot prove mail and wire fraud, then money laundering is out of the case. (Doc. 251 at 10).

The court does not view defendants' failure to address money laundering/racketeering as some sort of admission. On the other hand, the government's evidence regarding the transactions supporting the charges is undisputed.

Therefore, for the purposes _only_ of the issues pertaining to coconspirator hearsay, the court will follow the parties' memoranda and not attempt to make a separate analysis of the two conspiracies.

### Existence of the Conspiracies

The court finds that the government's direct and circumstantial evidence, coupled with reasonable inferences therefrom, is sufficient to show the existence of the alleged conspiracies, with the exception of the CCTA. A summary of the evidence is set out in Doc. 295 at 4 through 11. Defendants do not seriously dispute the facts set forth in the summary. Rather, as previously pointed out, they contest the incriminating inferences from the facts such as criminal intent to deceive and assert that they were acting in good faith. (Hall and

-13-

Sunflower, Doc. 262 at 3-14; Grantham, Doc. 250 at 2-4; Noe, Doc. 251 at 6-10; and Boyes, Doc. 273, more or less throughout).

The government presented sufficient evidence that defendants knew that Pipestone was re-selling and/or delivering 6-cent cigarettes to the other smoke shops which were selling them contrary to Oklahoma law. Hall's smoke shop, Shawnee Tobacco, which the government identified as Pipestone No. 15, was selling cigarettes with the 6-cent exception rate stamp instead of the appropriate tax in that area of 77 cents. (Doc. 290 at 6). When the OTC audited Sunflower and DTW, "[n]either company would give OTC the names of the smoke shops represented on their respective invoices with numbers assigned to each retailer, ie: the PO numbers. (Franks Trans. 113-116; James Tran. 323)." (Doc. 290 at 12). Both Hall and Boyes told the auditors that their customers would go elsewhere if they did not do what the customers wanted. Sunflower and DTW's financial reports reflect a drop in cigarette sales after the 2005 tax change but prior to April 2005, the point in which the government alleges the diversion began.

Defendants accurately point out that retail-to-retail sales were publicly known by the Oklahoma Tax Commission and Indian tribes.[8] Some tribes did approve of retail-to-retail sales. However, this

---

[8]For example, Hall and Sunflower argue that they "had a good faith basis for believing that the Oklahoma state tax laws, Cherokee tribal tax laws and the 2004 Oklahoma Cherokee cigarette compact permitted ..." retail-to-retail sales. (Doc. 262 at 9). Perhaps, but there is no evidence in the record regarding what Hall and Sunflower "believed." Similarly, while Hall and Sunflower may be correct in their argument that the good faith of a defendant is a "complete defense" to any charge containing an element of intent to defraud (id. at 12), that is not the posture of the case at this point. The cases cited by Hall and Sunflower deal with issues at a trial, not at a Rule 104(a) hearing.

evidence is more in the nature of a defense. For purposes of a motion to consider the admissibility of coconspirator hearsay under Fed R. Evid. 801(d)(2)(E), the government is not required to disprove or debunk a defendant's defense in order to meet its burden of proof to establish a conspiracy by a preponderance of evidence.

The court finds that the government has shown by preponderance of evidence that defendants Hall, Grantham, Noe, Boyes, Hooker, Sunflower, and DTW conspired as alleged in Counts 1 and 33.

### During Course of and in Furtherance of the Conspiracy

Statements must be made "during the course" of the conspiracy. Statements made after the conspiracy either failed or was achieved are not made "during the course" of the conspiracy for purposes of Fed. R. Evid. 801(d)(2)(E). <u>Perez</u>, 989 F.2d at 1579. Nor do acts or statements made to cover up a conspiracy after its completion qualify as statements made "during the course" of the conspiracy. <u>Id.</u> (citing <u>Krulewitch v. United States</u>, 336 U.S. 440, 442-43 (1949) and <u>Grunewald v. United States</u>, 353 U.S. 391, 401-02 (1957)).

Additionally, statements made during the course of the conspiracy must also be made in furtherance of the conspiracy. The Tenth Circuit applies the "in furtherance" test narrowly. <u>Perez</u>, 989 F.2d at 1578. "[S]tatements are not in furtherance of the conspiracy if they are 'mere narratives', that is 'statements relating to past events, even those connected with the operation of the conspiracy where the statement serves no immediate or future conspiratorial purpose,'" <u>Id.</u> (internal citations omitted). Statements are "in furtherance" of the conspiracy if they are intended "to promote the conspiratorial objectives." <u>Id.</u> (quoting <u>United States v. Wolf</u>, 839 F.2d 1387, 1393

-15-

(10th Cir. 1988)).

> Examples of statements which may be found to satisfy the "in furtherance" requirement include
>
> statements made to induce enlistment or further participation in the group's activities; statements made to prompt further action on the part of conspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a co-conspirator's fears; and statements made to keep co-conspirators abreast of an ongoing conspiracy's activities.

Id. (citing United States v. Nazemian, 948 F.2d 522, 529 (9th Cir. 1991)). The main focus is on the declarant's intent in making the statement as opposed to the effect the statement has on advancing the goals of the conspiracy. The court considers the context in which the challenged statement was made and determines whether it was intended to further the conspiracy. Id. at 1578-79 ("No talismanic formula exists for ascertaining whether a particular statement was intended by the declarant to further the conspiracy and is therefore admissible in accordance with the agency theory of conspiracy.").

### A. Statements[9]

The court finds that the following statements are admissible under Fed. R. Evid. 801(d)(2)(E) for the reasons discussed infra. The other statements do not meet the requirements under Fed. R. Evid. 801(d)(2)(E), but may or may not be admissible on other grounds. The admissibility of those statements can be handled by motion in limine.

### Statement 13

Statement 13 is between Richard Driskell, the director of

---

[9] Only defendants Hall and Sunflower (Doc. 262 at 14-16), Noe (Doc. 251 at 10-12) and Boyes (Doc. 273 at 8) make specific objections to statements.

Firelake Discount Foods and Grantham.[10] "Driskell recalls talking with Grantham one time about payments for money Firelake owed to Pipestone." (James hearing, Gov't exh. 44 at 3).

The declarant is defendant Grantham. The government presented evidence that Grantham was in charge of the day-to-day operations at Sunflower and the court has found that Grantham is a member of the conspiracy. Grantham's statement was made during the course of and in furtherance of the conspiracy. Driskell explained that Firelake ordered its cigarettes from Pipestone. Grantham's statement identifies defendants' payment scheme, i.e. Firelake pays Pipestone and then Pipestone pays Sunflower.

### Statements 20-22

Statements 20-22 were made by Grantham to R.H. R.H. wrote some of the computer programs used by Sunflower and aided in generating various reports that Sunflower is required to provide its manufacturers. The government presented evidence that R.H. was told by Grantham and other Sunflower employees that Pipestone was selling and/or delivering low-tax cigarettes to other smoke shops. Grantham told R.H. that "Sunflower sells cigarettes to Pipestone and what Pipestone does with the cigarettes is their business. Sunflower just sells to Pipestone ...." (James hearing, Gov't. exh. 44 at 6).

In statements 21-22, Grantham was explaining to R.H. the process by which other smoke shops were getting low-tax cigarettes. Statement 20 relates to what Grantham told R.H. to do regarding Davis' inventory from the Shawnee Tobacco store.

---

[10] Grantham makes no specific Fed. R. Evid. 801(d)(2)(E) objections to any of the statements attributed to him.

**Statements 36-38**

Statements 36-38 were made in e-mails from various R.J. Reynolds employees and Noe, R.H., Grantham, and Hooker. R.J. Reynolds wanted a list of smoke shops associated with the Pipestone account in which Sunflower and DTW were fulfilling cigarette orders. Statement 36 is an e-mail from R.H. to an R.J. Reynolds employee. R.H. states that "[Noe] like [R.H.] worry about the request coming directly from you. It would be better if the request came [from] Jeremy. He could request reports by purchase order number and we would not have the liability of you asking for a particular store." (<u>James</u> hearing, Gov't. exh. 7 at 8544).

Statement 37 involves e-mails and letters in which Hooker gives permission to R.J. Reynolds to request reports and notifies Grantham and R.H. of his authorization. Statement 38 concerns public statements made by Grantham about Sunflower and Hall. These statements are made by members and in furtherance of the conspiracy and meet Fed. R. Evid. 801(d)(2)(E).

**Statement 40**

Statement 40 involves e-mails from R.H. to R.J. Reynolds employees regarding generating reports by Pipestone PO numbers. R.H. states that Sunflower is "not supposed to know anything about Pipestone's sales to other "accounts[.]" Knowledge of such transactions may be considered an illegal action by the Oklahoma tax commission." (<u>James</u> hearing, Gov't. exh. 7 at 7811). R.H. goes on to say that the P.O. number is something Sunflower provides its customers and has no other meaning. The e-mails portray R.H.'s knowledge of the sales from Pipestone to other smoke shops and then

Sunflower's efforts to conceal its involvement.  Grantham and Noe are addressees in some of the e-mails.

Statements 52-53 were made by Grantham, and Hooker to either Carter or Coble concerning Rebel not hauling for Gawkskey anymore because it would not look good if Rebel was delivering cigarettes to locations other than Pipestone.  In statement 53, Hooker offered to pay Carter a rebate if he continued preparing the invoices for each of the other smoke shops.

Carter owns Gawkskey, Inc., which is a smoke shop in Webbers Fall, Oklahoma.  The government presented evidence that Carter introduced various smoke shop owners to Hooker.  Additionally, Carter is one of the signatories on the U.S. Bank account in Joplin, Missouri, ("the Gawkskey account").  Boyes and Noe are also signatories on this account.

From June 2005 to August 2005, several smoke shops would fax orders to Gawkskey.  Gawkskey would then fax these orders to Pipestone.  The smoke shops would also write checks payable to "Gawkskey," which were then deposited in the Gawkskey account.  Checks written from the Gawkskey account were then made payable to Pipestone which in turn would write checks to Sunflower and DTW.  During these three months, Carter would pick up cigarettes from Pipestone and deliver them to other smoke shops.

Statements 52-53 were made by declarants who were members of the conspiracy and further that these statements were made during the course and in furtherance of the conspiracy. Statements 52-53 reflect the coconspirators' goal of making it appear as though Sunflower and

DTW were selling cigarettes only to Pipestone.

### Statements 55 and 56

Statements 55 and 56 were made by Boyes to Carter. In statement 55, Boyes called Carter and told him that he could hire Rebel to deliver the cigarettes from Pipestone to the other smoke shops. In statement 56 "Boyes recommended that Carter open a bank account [in] Joplin ...." (James hearing, Gov't. exh. 44 at 15). The court finds that statements 55 and 56 were made during the course and in furtherance of the conspiracy because they were informing Carter of ways to transfer cigarettes and payments from Pipestone to the smoke shops and vice versa.

### Statements 59 and 60

Statements 59 and 60 were made by Grantham and Hooker to Carter. Grantham told Carter to stop using Rebel to deliver the cigarettes to the other smoke shops. Rebel stopped the deliveries, but Hooker still asked Carter to continue preparing the cover sheets that went with the smoke shops' orders. The government presented evidence at the James hearing that Rebel stopped delivering to the other smoke shops because Noe, R.H., and Grantham thought it might look bad if Rebel was delivering Pipestone PO orders to other smoke shops. After August 2005, Rebel only delivered Pipestone PO orders to Pipestone in Vinita. Hooker was responsible for faxing the smoke shops' orders to Sunflower and DTW and asked Carter to continue preparing the cover sheets.

### Statement 68

In statement 68, Hooker told Coble that "he (Hooker) could do with the cigarettes what he wanted after he received delivery." (James hearing, Gov't. exh. 44 at 18). The court finds that statement 68

reinforces the goals of the conspiracy to create the appearance that Sunflower and DTW were not involved in the delivery of low-tax cigarettes from Pipestone to the other smoke shops.

### Statement 71

Statement 71 was made to reinforce the goals of the conspiracy by creating the appearance that Rebel was a separate and distinct player in delivering cigarettes to Pipestone. Hall and Grantham told Coble to "stick to telling everyone he owns Rebel." (James hearing, Gov't. exh. 44 at 19). Statement 71 minimizes Sunflower and DTW's involvement in the overall conspiracy.

### Statements 73 and 74

Statements 73 and 74 were made by Hooker to a Sunflower employee and to the other smoke shops. Hooker called the Sunflower employee and "asked if Sunflower could accept orders from the smoke shops locations with a different "Pipestone" number on the order. (James hearing, Gov't. exh. 44 at 21). Hooker then gave the smoke shops a different Pipestone number and told them to fax their orders directly to Sunflower.

Hooker told law enforcement about these events during an interview on May 9, 2007. While it appears as though Hooker was describing past events, the actual statements made from Hooker to the Sunflower employee and smoke shops occurred during the course of the conspiracy. The statements were also made in furtherance of the conspiracy as instructions to other parties on how to conceal the fact that smoke shops not authorized to sell low-tax cigarettes are ordering cigarettes bearing the 6-cent tax stamp.

## Confrontation Clause

Defendants contend that their Sixth Amendment right to confront witnesses will be violated if coconspirator statements are admitted at trial. "The Sixth Amendment's Confrontation Clause provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him.'" <u>Crawford v. Washington</u>, 541 U.S. 36, 42 (2004). <u>Crawford</u> held that:

> the Clause bars the admission of "testimonial" hearsay unless (1) the declarant testifies at trial, <u>id.</u> at 59 n. 9, 124 S.Ct. 1354, or (2) the declarant is unavailable to testify and was previously subject to cross-examination concerning the statement, <u>id.</u> at 59, 124 S.Ct. 1354.

<u>United States v. Faulkner</u>, 439 F.3d 1221, 1225 (10th Cir. 2006).

Defendants argue that the majority of these statements were testimonial because they were made during interviews by law enforcement. Additionally, coconspirators, who are also defendants in this case, are unavailable and defendants have not had a opportunity to cross-examine coconspirators regarding their statements.

The court finds that the statements, which are admissible under Fed. R. Evid. 801(d)(2)(E), are not "testimonial" in nature. The statements were made by coconspirators to other coconspirators and/or employees during the course and in furtherance of the conspiracy. Although the majority of the statements became known to the government in the course of interviews by law enforcement, the point at which the statements were actually made was not during these interviews. "[N]o reasonable person in the position of [defendants and other] declarants would have objectively foreseen that these statements would be used in the investigation or prosecution of their conspiracy." <u>United</u>

States v. Townley, 472 F.3d 1267, 1275 (10th Cir. 2007). As such, the government statements that are admissible under Fed. R. Evid. 801(d)(2)(E) do not violate defendants' Sixth Amendment rights.

**IV.  CONCLUSION**

Defendants' motions to determine the admissibility of coconspirator hearsay under Fed. R. Evid. 801(d)(2)(E) (Doc. 127, 250, 251, 262, 273) are granted in part and denied in part.  The court finds that the government has not shown by preponderance of evidence that defendants conspired to violate or violated the CCTA, but has met its burden to show that defendants otherwise conspired to divert as alleged.  None of the findings contained herein or in Doc. 314 amount to a dismissal, but are purely related to the admissibility of coconspirator hearsay under Fed. R. Evid. 801(d)(2)(E).


IT IS SO ORDERED.

Dated this __21st__ day of April 2010, at Wichita, Kansas.


                                        s/ Monti Belot
                                        Monti L. Belot
                                        UNITED STATES DISTRICT JUDGE