## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | **CRIMINAL ACTION** |
| | ) | |
| v. | ) | No. 08-10208-01 |
| | ) | -11 |
| GARY LESTER HALL, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

Before the court are the following:

1.    Defendant Keith Noe's Motion to Dismiss (Docs. 276 and 277);

2.    Government's response (Doc. 293);

3.    Noe's Reply (Doc. 306);

4.    Government's Response to Court's Request for Clarification (Doc. 343); and

5.    Noe's Reply (Doc. 344).

Each of the other defendants has joined in Noe's motion (Docs. 278, 279, 280, 283, 284 and 304).

The court has considered other submissions referred to in the aforementioned pleadings as well as his previous orders.  These will be noted, as appropriate.

## Background

The parties are very familiar with the relevant facts, which will not be repeated in detail.  Any reader not familiar may consult the Indictment filed October 15, 2008 (Doc. 1) and this court's Memoranda and Orders (Docs. 213, 236, 244, 314, 315, 330, 336, 337 and 339).

Defendants are charged with conspiracy to violate the Contraband

Cigarette Trafficking Act, 18 U.S.C. § 2341, et seq., (CCTA), substantive violations of the CCTA, 18 U.S.C. § 1341 (mail fraud), § 1343 (wire fraud), §§ 1952, 1956(a)(1)(A)(i), (B)(i) and 1957 (racketeering and money laundering). But all the charges relate to the CCTA. Defendants mount a direct "as applied" 14th Amendment Due Process challenge to 18 U.S.C. § 2343(a)[1], the recordkeeping provisions of the CCTA, and a derivative challenge to all of the other charges. Each of the statutes requires proof of some mental element, e.g., knowledge, intent and/or willfulness. None of defendants contend that they were unaware that the laws pertaining to the cigarette business required them to prepare and maintain certain records. Rather, their argument is that they fully complied with all applicable statutory and regulatory requirements and that if the recordkeeping and reporting requirements of § 2343(a) and any related statutes and regulations required the reporting of the ultimate purchaser and/or destination of the cigarettes (which the government says they did and defendants say they didn't) then § 2343(a) is unconstitutionally vague because (1) its provisions failed to give them "fair notice" of any "ultimate purchaser/destination" requirement and (2) the relevant statutory and regulatory language unconstitutionally vests in law enforcement officers, prosecutors and juries the ability to assign their own subjective meaning to one or more elements of the offenses.

Generally Applicable Law

An "as applied" void-for-vagueness challenge has two elements:

---

[1]The indictment, at p. 13, cites § 2343(b). The government has corrected the citation to § 2343(a) (Doc. 293 at 3).

fair notice and enforcement standards.

> A statute is impermissibly vague if it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits. Additionally, a statute that authorizes or encourages arbitrary and discriminatory enforcement can be impermissibly vague.

United States v. Franklin-El, 554 F.3d 903, 910 (10th Cir. 2009)

(internal citations and quotations omitted).

> [T]he void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement. The same facets of a statute usually raise concerns of both fair notice and adequate enforcement standards. Hence the analysis of these two concerns tends to overlap. The Supreme Court, however, while ... recognizing the second concern as more important, continues to treat each as an element to be analyzed separately.

> Regarding fair notice, [o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness.

* * *

> Regarding the adequacy of enforcement standards, [d]ue process requires that legislation state reasonably clear guidelines for law enforcement officials, juries, and courts to follow in discharging their responsibility of identifying and evaluating allegedly illegal conduct. Where the legislature fails to provide such minimal guidelines, a criminal statute may permit a standardless sweep [that] allows policemen, prosecutors, and juries to pursue their personal predilections. A statute is unconstitutionally vague if its language and construction by the courts vest authority in law enforcement officers, prosecutors, and juries to assign their own subjective meaning to an element of the offense.

United States v. LaHue, 261 F.3d 993, 1006 (10th Cir. 2001) (internal

citations, quotations and footnotes omitted).

> The constitutionality of an arguably vague statutory standard is closely related to whether that standard incorporates a *mens rea* requirement. The presence of a scienter inquiry can save an otherwise vague statute. The

Supreme Court has recognized that a scienter requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed. Although a specific intent requirement does not necessarily validate a criminal statute against all vagueness challenges, it does eliminate the objection that the statute punishes the accused for an offense of which he was unaware.

United States v. Franklin-El, id. at 911.

The parties agree that the court's review is based on the charged facts, United States v. LaHue, id. at 1005. In addition, the parties have liberally referred to facts adduced at the Franks and James hearings.

The CCTA looks to the specific state's law to determine any violations involving the payment of the "applicable" state tax. United States v. Brigman, No. CR-08-029-JLQ, 2008 WL 4330315 (E.D. Wash. Sept. 15, 2008). Stated another way, "A violation of the state cigarette tax law is a predicate to a CCTA violation." United States v. Gord, 77 F.3d 1192, 1193 (9th Cir. 1996).

Applicable Portions of Statutes and Regulations[2]

## 15 U.S.C. § 375 Definitions.

For purposes of this chapter--

(1) The term "person" includes corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.

(2) The term "cigarette" means any roll for smoking made wholly or in part of tobacco, irrespective of size or shape and whether or not such tobacco is flavored, adulterated, or mixed with any other ingredient, the wrapper or cover of which is made of paper or any other substance or material except tobacco.

---

[2]As applicable to the relevant time period, unless otherwise noted. Only those portions of the statutes and regulations cited by the parties and/or arguably applicable are set out.

(3) The term "distributor licensed by or located in such State" means—

    (A) in the case of any State which by State statute or regulation authorizes the distribution of cigarettes at wholesale or retail, any person so authorized, or

    (B) in the case of any other State, any person located in such State who distributes cigarettes at wholesale or retail;

but such term in no case includes a person who acquires cigarettes for purposes other than resale.

(4) The term "use", in addition to its ordinary meaning, means the consumption, storage, handling, or disposal of cigarettes.

## 15 U.S.C. § 376. Reports to State tobacco tax administrator.

(a) Contents

Any person who sells or transfers for profit cigarettes in interstate commerce, whereby such cigarettes are shipped into a State taxing the sale or use of cigarettes, *to other than a distributor licensed by or located in such State,* or who advertises or offers cigarettes for such a sale or transfer and shipment, shall--

    (1) first file with the tobacco tax administrator of the State into which such shipment is made or in which such advertisement or offer is disseminated a statement setting forth his name and trade name (if any), and the address of his principal place of business and of any other place of business, and

    (2) not later than the 10th day of each calendar month, file with the tobacco tax administrator of the State into which such shipment is made, a memorandum or a copy of the invoice covering each and every shipment of cigarettes made during the previous calendar month into such State; the memorandum or invoice in each case to include the name and address of the person to whom the shipment was made, the brand, and the quantity thereof,

(b) Presumptive evidence

The fact that any person ships or delivers for shipment any cigarettes shall, if such shipment is into a State in which such person has filed a statement with the tobacco tax administrator under subsection (a)(1) of this section, be presumptive evidence (1) that such cigarettes were sold, or

transferred for profit, by such person, and (2) that such sale or transfer was to other than a distributor licensed by or located in such State.

(Emphasis supplied).[3]

## 18 U.S.C. § 2341 Definitions.

(2) the term "contraband cigarettes" means a quantity in excess of 60,000[4] cigarettes, which bear no evidence of the payment of applicable State or local cigarette taxes in the State or locality where such cigarettes are found, if the State or local government requires a stamp, impression, or other indication to be placed on packages or other containers of cigarettes to evidence payment of cigarette taxes, and which are in the possession of any person other than--

(A) a person holding a permit issued pursuant to chapter 52 of the Internal Revenue Code of 1986 as a manufacturer of tobacco products or as an export warehouse proprietor, or a person operating a customs bonded warehouse pursuant to section 311 or 555 of the Tariff Act of 1930 (19 U.S.C. 1311 or 1555) or an agent of such person;

(B) a common or contract carrier transporting the cigarettes involved under a proper bill of lading or freight bill which states the quantity, source, and destination of such cigarettes;

(C) a person-

\* \* \*

(ii) who has complied with the accounting and payment requirements relating to such license or authorization with respect to the cigarettes involved;

\* \* \*

---

[3]Defendants are not charged with a violation of § 376. Sunflower and DTW shipped cigarettes from Kansas to Pipestone located in Vinita, Oklahoma. Pipestone was a "distributor" as defined by § 375(3) and 68 O.S. § 301. Therefore, § 376 did not require Sunflower and DTW to file reports with Oklahoma and the government does not contend otherwise.

[4]In 2006, Pub. L. 109-177, § 121(a)(1) lowered the amount to 10,000 cigarettes. The amount or number of cigarettes in the statutes and regulations is not material.

(3) the term "common or contract carrier" means a carrier holding a certificate of convenience and necessity, a permit for contract carrier by motor vehicle, or other valid operating authority under subtitle IV of title 49, or under equivalent operating authority from a regulatory agency of the United States or of any State;

## 18 U.S.C. § 2343 Recordkeeping and inspection.

(a) Any person who ships, sells, or distributes any quantity of cigarettes in excess of 60,000 in a single transaction shall maintain such information about the shipment, receipt, sale, and distribution of cigarettes as the Attorney General *may prescribe* by rule or regulation. The Attorney General *may require* such person to keep only (1) the name, address, *destination* (including street address), vehicle license number, driver's license number, signature of the person receiving such cigarettes, and the name of the purchaser; (2) a declaration of the specific purpose of the receipt (personal use, resale, or delivery to another); and (3) a declaration of the name and address of the recipient's principal in all cases when the recipient is acting as an agent.

Such information shall be contained on business records kept in the normal course of business.

Nothing contained herein shall authorize the Attorney General to require reporting under this section.

(Emphasis supplied).

## 27 C.F.R. § 646.143 provided:

Distributor. Any person who distributes more than 60,000 cigarettes in a single transaction.

Exempted person. Any person who is-

(e) Licensed or otherwise authorized by the State, in which he possesses cigarettes, to account for and pay cigarette taxes imposed by that State; and who has complied with the accounting and payment requirements relating to his license or authorization with respect to the cigarettes involved;[5]

## 27 C.F.R. § 646.146 provided:

---

[5]Sunflower, DTW and Rebel were "exempted persons." (Doc. 343 at 9). It is not clear whether Pipestone in Vinita, Oklahoma, was an "exempted person." The indictment alleges that Jeremy Hooker was the "operator" of Pipestone (Doc. 1 at ¶ 8).

Each distributor of cigarettes shall keep copies of invoices, bills of lading, or other suitable commercial records relating to each disposition of more than 60,000 cigarettes. Dividing a single agreement for the disposition of more than 60,000 cigarettes into the delivery of smaller components of 60,000 cigarettes or less does not exempt the distributor from the recordkeeping requirements of this part. The distributor shall include the information prescribed in § 646.147 in his commercial records of disposition.

## 27 C.F.R. § 646.147 provided:

(a) Distributors who are exempted persons. Each distributor who is an exempted person as defined in § 646.143 shall show the following information in his commercial records.

(1) For each disposition of more than 60,000 cigarettes to an exempted person; or for each disposition of more than 60,000 cigarettes to a person who is not an exempted person and which is delivered by the distributor to the recipient's place of business, the distributor shall show on dated records-

    (I) The full name of the purchaser (or the recipient if there is no purchaser);
    (ii) The street address (including city and state) to which the cigarettes are destined; and
    (iii) The quantity of cigarettes disposed of;

(2) For each disposition of more than 60,000 cigarettes, *other than the dispositions specified in paragraph (a)(1)* of this section, the distributor shall show on dated records-

    (I) The full name of the purchaser (if any);
    (ii) The name, address (including city and state), and signature of the person receiving the cigarettes;
    (iii) The street address (including city and state) to which the cigarettes are destined;
    (iv) The quantity of cigarettes disposed of;
    (v) The driver's license number of the individual receiving the cigarettes;
    (vi) The license number of the vehicle in which the cigarettes are removed from the distributor's business premises;
    (vii) A declaration by the individual receiving the cigarettes of the specific purpose of receipt (such as personal use, resale, delivery to

another person, etc.);[6]

(Emphasis supplied).

**K.S.A. 79-3301 provided:**

(d) "Consumer" means the person purchasing or receiving cigarettes or tobacco products for final use.

(e) "Dealer" means any person who engages in the sale . . . of cigarettes in the state of Kansas, and who is required to be licensed under the provisions of this act.

* * *

(h) "Distributor" means: (1) Any person engaged in the business of selling tobacco products in this state who brings, or causes to be brought, into this state from without the state any tobacco products for sale; . . .

* * *

(r) "Sale" means any transfer of title or possession or both, exchange, barter, distribution or gift of cigarettes or tobacco products, with or without consideration.

* * *

(z) "Wholesale dealer" means any person who sells cigarettes to other wholesale dealers, retail venders, . . . for the purpose of resale in the State of Kansas.

**K.S.A. 79-3316 provided:**

(c) All invoices issued by wholesale dealers shall be in duplicate and a copy must accompany the consigned cigarettes. Cigarettes sold by a wholesale dealer to any other dealer shall be evidenced by invoices bearing the vendee's name and license number. . . .

(d) All records pertaining to sales of cigarettes by dealers in the state of Kansas shall be preserved for a period of three years and shall be available for inspection by the director or the director's designee at the dealer's place of business or, if the dealer has more than one place of business in the state, at a central location of the dealer.

---

[6]Sunflower, DTW and Rebel all fall within § (a)(1), whether or not Pipestone is an "exempted person." The court determines, as a matter of law, that Sunflower, DTW and Rebel are not subject to the requirements of § (a)(2).

(e) Every wholesale dealer shall report to the director on or before the 10th day of each month, stating the amount of cigarettes sold during the preceding month and the amount of all cigarettes returned to the manufacturer. . . . Such report shall be made on forms provided by the director and shall contain such other information as the director may require.

**The two-page required form provided:**



PACKS OF CIGARETTES NOT STAMPED FOR KANSAS (CG-16)
INSTRUCTIONS SOLD TO OUT OF STATE CUSTOMERS

**SOLD TO OUT OF STATE CUSTOMERS**
Check the box next to Sold to _____Customers
Enter the state the cigarettes were sold to. One state per sheet.
Enter your company's name, address and license number.
Enter the month and year you are filing.
Enter the name of the business you sold the cigarettes to.
Enter the business' address.
Enter the number of 20 count and 25 count cigarette packs you sold to the business.
Enter the page numbers.
Sign the form attesting the information is true and correct.
Enter your title with your company.
Enter today's date.

**68 O.S. § 301 provided:**

**Stamp excise tax upon sale, use, gift, possession or consumption of cigarettes**

For purposes of Section 301 <u>et seq.</u> of this title:

2. The term "person" is defined to mean and include any individual, company, . . .;

3. The term "wholesaler", "distributor" . . . is defined to mean and include a person, firm or corporation organized and existing, or doing business, primarily to sell cigarettes to, and render service to retailers in the territory such person, firm or corporation chooses to serve, and that:

   a. purchases cigarettes directly from the manufacturer,

   b. at least seventy-five percent (75%) of whose gross sales are made at wholesale,

   c. handles goods in wholesale quantities and sells through salespersons, advertising and/or sales promotion devices,

   d. carries at all times at its principal place of business a representative stock of cigarettes for sale, and

   e. comes into the possession of cigarettes for the purpose of selling them to retailers or to persons outside or within the state who might resell or retail such cigarettes to consumers.

4. The term "retailer" is defined to be:

   a. a person who comes into the possession of cigarettes for the purpose of selling, or who sells them at retail,

5. The term "consumer" is defined to be a person who receives or who in any way comes into possession of cigarettes for the purpose of consuming them, giving them away, or disposing of them in a way *other than by sale*, barter or exchange;

* * *

10. The term "distributing agent" shall mean and include every person in this state who acts as an agent of any person outside the state by receiving cigarettes in interstate commerce and storing such cigarettes subject to distribution or delivery upon order from the person outside the state to distributors, wholesale dealers and retail dealers, or to consumers. The term "distributing agent" shall also mean and include any person who solicits or takes orders for cigarettes to be shipped in interstate commerce to a person in this state by a person residing outside of Oklahoma, the tax not having been paid on such cigarettes;

(Emphasis supplied).

## 68 O.S. § 302 provided:

There is hereby levied upon the sale, use, gift, possession, or consumption of cigarettes within the State of Oklahoma a tax at the rate of four (4) mills per cigarette.

* * *

The tax hereby levied shall be paid only once on any cigarettes sold, used, received, possessed, or consumed in this state. The tax shall be evidenced by stamps which shall be furnished by and purchased from the Tax Commission or by an impression of such tax by the use of a metering device when authorized by the Tax Commission as provided for in Section 301 et seq. of this title, and the stamps or impression shall be securely affixed to one end of each package in which cigarettes are contained or from which consumed.

The impact of the tax levied by the provisions of Section 301 et seq. of this title is hereby declared to be on the vendee, user, consumer, or possessor of cigarettes in this state, and, when the tax is paid by any other person, such payment shall be considered as an advance payment and shall thereafter be added to the price of the cigarettes and recovered from the ultimate consumer or user. In making a sale of cigarettes in this state, a wholesaler or jobber may separately state and show upon the invoice covering the sale the amount of tax paid on the cigarettes sold. The tax shall be evidenced by appropriate stamps attached to each package of cigarettes sold.

## 68 O.S. § 312 provided:

§ 312. Records and reports

A. Every person subject to the payment of a tax hereunder shall keep in Oklahoma accurate records covering the business carried on and shall for three (3) years, and more if required by the rules of the Oklahoma Tax Commission, keep and preserve all invoices, showing all purchases and sales of cigarettes; and such invoices and stock of cigarettes shall at all times be subject to the examination and inspection of any member or legally authorized agent or representative of the Tax Commission, in the enforcement of this article. Every wholesaler or retailer operating in the State of Oklahoma, whose main warehouse or headquarters is in another state shall keep all records of all cigarette transactions made by him or her at his or her place of business in Oklahoma, or at a designated place in the State of Oklahoma.

* * *

C. Every distributing agent shall, except as otherwise provided herein, keep at each place of business in Oklahoma for a period of three (3) years for inspection by the Tax Commission a complete record of all cigarettes received, including all orders, invoices, bills of lading, waybills, freight bills, express receipts, and all other shipping records which are furnished to the distributing agent by the carrier and the shipper of said cigarettes, or copies thereof, and, in addition thereto, a complete record of each and every distribution or delivery made by said distributing agent. Such records of distribution or delivery shall include all orders, invoices or copies thereof, all other shipping records furnished by the carrier, and the person ordering distribution or delivery of the cigarettes.

D. Upon a form to be prescribed by the Tax Commission, every distributing agent in Oklahoma shall report each day, except Sundays and holidays, to the Tax Commission all deliveries of cigarettes made on the preceding day or days.[7] The reports shall show the name of the person ordering the delivery, date of delivery, name and address of the person to whom delivered, the invoice number, bill of lading or waybill number, the number and kind of cigarettes delivered, the means of delivery and/or the transportation agent and the destination of drop shipment, if a drop

---

[7]Sunflower and DTW do not meet the definition of "distributing agent" and the government does not contend otherwise. It is unclear whether the government contends that Pipestone in Vinita was a "distributing agent." No <u>daily</u> reporting form has been received in evidence.

shipment. However, if the invoice furnished the distributing agent by the manufacturer or other person ordering such delivery, or the bill of lading prepared by said distributing agent to cover the shipment under said invoice, contains all the information required to be reported, it will be sufficient to send a copy of said invoice or invoices, or a copy of said bill of lading or bills of lading, to the Tax Commission.

**68 O.S. § 312.1 provided:**[8]

**Procedures for maintaining records and filing reports--Required information**

A. The Oklahoma Tax Commission, if in its discretion it deems practical and reasonable, may establish procedures for maintaining records and filing reports containing the information required by this section. The exercise by the Tax Commission of the authority granted in this subsection shall be by adoption of rules necessary to establish procedures that increase compliance with the requirements of this article. If the Tax Commission determines to utilize its discretion, the provisions of subsections B through J of this section shall apply.

B. Every wholesaler and distributor receiving cigarettes

---

[8]2009 Oklahoma Senate Bill 608, enacted in 2010, amended 68 O.S. § 312.1. It now provides, in pertinent part:

B. Every wholesaler receiving cigarettes shall submit periodic reports containing the information required by this subsection. In each case, the information required shall be itemized so as to disclose clearly the brand style of the product. The reports shall be provided separately with respect to each of the facilities operated by the wholesaler and shall include:

1. The quantity of cigarette packages that were distributed or shipped to another wholesaler or to a retailer within the borders of Oklahoma during the reporting period and the name and address of each person to whom those products were *ultimately* distributed or shipped;

(Emphasis supplied). Heretofore, no Oklahoma statute or regulation used the word "ultimately." This is significant because it is the government in this case, not Oklahoma, which has inserted "ultimate" into the statutes and regulations which were in place during the relevant period.

shall submit periodic reports containing the information required by this subsection. In each case, the information required shall be itemized so as to disclose clearly the brand style of the product. The reports shall be provided separately with respect to each of the facilities operated by the wholesaler and distributor and shall include:

1. The quantity of cigarette packages that were distributed or shipped to another distributor or to a retailer within the borders of Oklahoma during the reporting period and the name and address of each person to whom those products were distributed or shipped;

2. The quantity of cigarette packages that were distributed or shipped to another facility of the same distributor within the borders of Oklahoma during the reporting period; and

3. The quantity of cigarette packages that were distributed or shipped within the borders of Oklahoma to Indian tribal entities or instrumentalities of the federal government during the reporting period and the name and address of each person to whom those products were distributed or shipped.

* * *

D. The Tax Commission shall establish the reporting period, which shall be no longer than three (3) calendar months and no shorter than one (1) calendar month. Reports shall be submitted electronically as prescribed by the Tax Commission.

E. Each distributor shall maintain copies of invoices or equivalent documentation for each of its facilities for every transaction in which the distributor is the seller, purchaser, consignor, consignee, or recipient of cigarettes. The invoices or documentation shall show the name, address, phone number and wholesale license number of the consignor, seller, purchaser, or consignee, and the quantity by brand style of the cigarettes involved in the transaction.

* * *

H. Records required under subsections E through G of this section shall be preserved on the premises described in the license in such a manner as to ensure permanency and accessibility for inspection at reasonable hours by authorized personnel of the Oklahoma Tax Commission. With the permission of the Tax Commission, manufacturers, distributors, and retailers with multiple places of business may retain centralized records, but shall transmit

duplicates of the invoices or the equivalent documentation to each place of business within twenty-four (24) hours upon the request of the Tax Commission.

I. The records required by subsections E through G of this section shall be retained for a period of three (3) years from the date of the transaction.

J. The Tax Commission, upon request, shall have access to reports and records required under this act.[9] The Tax Commission at its sole discretion may share the records and reports required by such sections with law enforcement officials of the federal government, the State of Oklahoma, other states, or international authorities.

**68 O.S. § 317.5 provided:**

**Filings with Tax Commission**

A. Prior to making delivery sales or mailing, shipping, or otherwise delivering cigarettes in connection with any such sales, every person shall file with the Oklahoma Tax Commission a statement[10] setting forth such person's name, trade name, and the address of such person's principal place of business and any other place of business.

B. Not later than the tenth day of each calendar month, each person that has made a delivery sale or mailed, shipped or otherwise delivered cigarettes in connection with any such sale during the previous calendar month shall file with the Tax Commission a memorandum or a copy of the invoice which provides for each and every such delivery sale:

1. The name and address of the individual to whom such delivery sale was made;

2. The brand or brands of the cigarettes that were sold in such delivery sale; and

---

[9]Title 68 § 301 et seq.

[10]The evidence, including the testimony of case agent Martin (infra), established that Oklahoma used Kansas form CG-16 and that the reports made on Kansas form CG-16 contained no false information insofar as Kansas law was concerned. When asked if she was aware of any Kansas tax violations, agent Martin responded: "That I'm aware of, there was no Kansas tax violations." (James hearing transcript Doc. 258 at 29). As noted elsewhere, the court rejects agent Martin's "opinion" regarding what should have been on form CG-16. The government has not identified any other "statement."

3. The quantity of cigarettes that were sold in such delivery sale.

C. Any person that satisfies the requirements of Section 376 of Title 15 of the United States Code shall be deemed to satisfy the requirements of this section.

**OAC 710:70-2-2 provided:**

**Definitions**

The following words and terms shall have the following meaning unless the context clearly indicates otherwise:

*"Cigarette" means all rolled tobacco or any substitute therefor, wrapped in paper or any substitute therefor and weighing not to exceed three (3) pounds per thousand cigarettes. [68 O.S. § 301(1)]*

*"Delivery sale" means:*

*(A) Any sale of cigarettes to a consumer in Oklahoma where either:*

*(i) The purchaser submits the order for such sale by means of a telephonic or other method of voice transmission, by use of the mails, or by any other delivery service, including the Internet or other online service; or,*
*(ii) The cigarettes are delivered by use of the mails or other delivery service.*

*(B) A sale of cigarettes which satisfies the criteria in subparagraph (A) of this paragraph shall be a "delivery sale" regardless of whether the seller is located within or outside of Oklahoma.*

**"Delivery sale"** *shall include any sale of cigarettes to an individual in Oklahoma and shall be treated as a sale to a consumer unless such individual is licensed as a distributor or retailer of cigarettes by the Tax Commission; but shall not include a sale of cigarettes, not for personal consumption, to a person who is a wholesale dealer or a retail dealer. [68 O.S. § 301(13)]*

**OAC 710:70-2-11 provided:**

**Requirements placed on distributors and retailers to maintain copies of invoices**

(a) Distributors shall keep copies of invoices or equivalent documentation for each of its facilities for every transaction in which the distributor is the seller,

purchaser, consignor, consignee, or recipient of cigarettes. The invoices or documentation must show the name, address, phone number and wholesale license number of the consignor, seller, purchaser, or consignee, and the quantity by brand style of the cigarettes involved in the transaction. [68 O.S. § 312.1(E)].

\* \* \*

(c) The invoices or equivalent documentation must be kept on the premises described in the license in such a manner as to ensure permanency and accessibility for inspection at reasonable hours by authorized personnel of the Oklahoma Tax Commission. With the permission of the Tax Commission, manufacturers, distributors, and retailers with multiple places of business may retain centralized records, but must transmit duplicates of the invoices or the equivalent documentation to each place of business within twenty-four (24) hours upon the request of the Tax Commission. Written requests for permission to keep centralized records should be submitted to the Audit Division of the Oklahoma Tax Commission by mail at 2501 Lincoln Blvd., Oklahoma City, Ok 73194 or by FAX at (405) 522-4450. [68 O.S. § 312.1(H)].

(d) The invoices or equivalent documentation must be retained for a period of three (3) years from the date of the transaction. [68 O.S. § 312.1(I)].

**OAC 710:70-2-12 provided:**

**Limitation on sale of number of packs of cigarettes at a reduced tax rate**

(c) No Wholesaler may sell packs of cigarettes at a reduced tax rate to any tribal retailer,[11] unless the name of the tribal retailer appearing on the order and/or invoice to be issued on the transaction also appears on the list of tribal retailers compiled and furnished by the Oklahoma Tax Commission (hereafter, "OTC") to licensed wholesalers. For purposes of compliance with this Rule, wholesalers are entitled to rely on the accuracy of the list of tribal retailers compiled and furnished by the OTC.

**OAC 710:70-2-50 provided:**

**Filing requirements for persons making "delivery sales of cigarettes"**

(a) **General**. Before delivering any cigarettes to

---

[11]The term "tribal retailer" does not appear to be specifically defined in any Oklahoma statute or regulation.

purchasers, every person making delivery sales into
Oklahoma, or mailing, shipping, or otherwise delivering
cigarettes in connection with any such sales, must provide
to the Oklahoma Tax Commission a written statement
containing the following information:
(1) The name of the seller;
(2) The trade name of the seller;
(3) The address of the principal place of business of the
seller; and,
(4) The address of any other place of business of the
seller. [68 O.S. § 317.5(A)]

(b) **Monthly report of delivery sales required.** No later
than the tenth day of each calendar month, each person who
has made a delivery sale, or mailed, shipped, or otherwise
delivered cigarettes in connection with any such sale
during the previous month, must make a memorandum report to
the Oklahoma Tax Commission of the following information:
(1) The name of the purchaser;
(2) The brands of cigarettes sold; and,
(3) The quantity of cigarettes sold. [68 O.S. § 317.5(B)]

(c) **Alternative method of compliance with reporting
requirement.** Any person who satisfies the requirements set
out in 15 U.S.C. § 376 shall be deemed to have met the
reporting requirements set out in (b) of this Section. [68
O.S. § 317.5(C)]

**OAC 710:70-5-3 provided:**

**Minimum requirements of monthly tobacco products tax
reports of licensed manufacturers or wholesalers,
warehousemen, distributors or jobbers**

Every licensed manufacturer, and every wholesaler, jobber,
distributor, retailer and consumer, licensed by the
Oklahoma Tax Commission, to possess, use or in any manner
deal with tobacco products subject to the excise tax, *upon
which such tax has not been paid*,[12] shall report, to the
Oklahoma Tax Commission, all purchases and invoices of all
such tobacco products and merchandise subject to such
excise tax monthly, on the Monthly Tobacco Products Tax
Report form prescribed by the Commission. Each monthly
report shall include the following information:

---

[12]The court determines as a matter of law that Sunflower and DTW
are not covered by this section. It is undisputed that Sunflower and
DTW paid a tax, just not the tax the government contends they should
have paid. Rebel is not covered because it was not a "distributor"
as defined by 68 O.S. § 301.3.

-19-

(1) Name, business address and Tobacco License Number of the tax reporter;

(2) All purchases or deliveries, stated separately according to the dates of delivery in the State, of all tobacco products received, possessed, used or in any manner dealt with in the previous calendar month;

(3) Invoice numbers of all purchases or deliveries of such products for the previous calendar month;

(4) Name and business address of each consignee and consignor; and

(5) Copy of each invoice of all purchases or deliveries of such products for the previous month attached to the monthly report form. Copies of invoices submitted shall be subject to destruction upon completion of an office audit of the monthly report and shall not discharge the reporter from the statutory duty to maintain records and files of all such transactions. [See: 68 O.S. §201; 68 O.S. §§401 et seq.]

(Emphasis supplied).

**OAC 710:70-5-8 provided:**

**Reports on tobacco products by persons, retailers, consumers, common carriers, bonded warehousemen or bailees other than those required to report and pay tax**

(a) Every person or entity, listed below, who possesses, controls, transports, uses or in any manner deals with tobacco products within this State subject to the tobacco products excise tax, *upon which the tax has not been paid,*[13] even though not the party required to pay the tax, shall file a monthly report to the Oklahoma Tax Commission on prescribed forms as follows:

(1) Every retailer or consumer purchasing tobacco products subject to tax in drop shipments shall report those purchases to the Oklahoma Tax Commission on the Monthly Tobacco Products Tax Reports in accordance with 710:70-5-3 through 710:70-5-5, as required of licensed manufacturers, wholesalers, jobbers, distributors, retailers or consumers.

(2) Every common carrier transporting tobacco products, subject to tax, to a point within this State shall monthly report to the Oklahoma Tax Commission the following information:

(A) Name and business address of the carrier;

(B) The date of delivery of each shipment of said tobacco products transported and delivered into this State in the

---

[13]*Id.*, even though Rebel was a "common carrier."

previous calendar month;
(C) The point of origin and the point of delivery of each shipment of said tobacco products transported and delivered into this State in the previous calendar month;
(D) The name of the person or entity to whom said tobacco products were delivered in this State in the previous calendar month; and
(E) Copies of all invoices, bills of lading or instruments of consignment of said tobacco products transported and delivered into this State in the previous calendar month, attached to said report.

(Emphasis supplied).

## The Government's Positions

At the risk of lengthening this memorandum, the court has tried to fairly and completely present the government's positions, rather than to summarize or paraphrase them.

In an initial response to Noe's motion (Doc. 171), the government stated:

The conspiracy in Count 1 charges the defendants with the first prong: committing offenses against the United States, and goes on to list the exact federal offenses committed, including violations of the Contraband Cigarette Trafficking Act (CCTA); mail and wire fraud; and money laundering. These crimes resulted in a tremendous loss of tax revenue for the State of Oklahoma and the Native American tribes. The indictment establishes that this was accomplished by Sunflower Supply Company, Inc. ("Sunflower") deliberately stamping the cigarettes, sold by them and by Discount Tobacco Warehouse, Inc., ("DTW") and destined for high tax rate areas in Oklahoma with inappropriate stamps meant for the lowest tax area. By doing this, and hiding the knowledge of the ultimate destination where the cigarettes were actually being sold, the defendants were allegedly successful in their scheme. Each crime listed has a specific intent component, and lists what the defendants are alleged to have done. Doc. 1, Indictment, Introduction and Count 1, ¶¶ 1-24.

The Manner and Means portion, which incorporates the prior paragraphs, lists the background on the diversion conspiracy, including how the companies used to implement the conspiracy - Sunflower Supply Company, Inc.("Sunflower"), Discount Tobacco Warehouse, Inc. ("DTW") and Rebel Industries, Inc. ("Rebel")- came to be created; how Oklahoma cigarette tax and excise statutes are

structured; how the State of Oklahoma provided part of the taxes collected to the Native American tribes; that the violations of the Oklahoma tax laws deprived the tribes and the state of lawful tax revenue. *Id*. at ¶¶ 25-412. It also alleges that in order to hide the diversion scheme, the defendant committed various federal crimes. The defendants maintained records required under the CCTA which contained false ultimate destinations for the cigarettes sold by Sunflower and DTW; the defendants mailed false reports to the Department of Revenue in Kansas to hide their knowledge of the ultimate destination of the cigarettes; used the internet to receive cigarette orders which crossed state lines; accepted cash payments for cigarettes by check delivered interstate by Rebel, or by wire transfer; and used numerous bank accounts to funnel the monies given in payment to Sunflower and DTW, which was then used to purchase more cigarettes from the large manufactures. [Sic.] (*Id*. at ¶¶ 42-47).

The <u>Overt Acts</u> portion also incorporates prior paragraph, and lists the scheme to divert cigarettes, the defendants and people involved, and there [sic] roles, as it existed initially from February 2005, after the law changed to the seven tier system, until June of 2005. *Id*. at ¶¶ 48-55. In Paragraphs 56-66, the procedure to implement the scheme changes, and Rebel began delivering the contraband cigarettes, stamped with "6 cents" stamps, to the higher tax stamp retail stores directly, as well as bringing the payments from the high tax retailers to Sunflower and DTW directly. Lastly, after August of 2005 through at least May 8, 2007, the scheme changed in that Rebel delivered the contraband cigarettes to the 6 cent retail store, Pipestone, then all the retailers came there and off loaded their cigarettes to be taken to their higher tax area store for sale to the ultimate consumer. (*Id*. at ¶ 67). It was during this latter period that Shawnee Tobacco, a retail smoke shop located in a "78 cent" tax stamp area, which was leased by defendant Gary Hall and managed by defendant Danny Davis, received cigarettes with "6 cent" stamps on them to be sold in the "78 cent" area to the ultimate consumer. *Id*. at ¶¶ 68-69.

(Doc. 171 at 4-7).

The government's theory is additionally explained in a later submission (Doc. 293):

Moving to the mail fraud crimes alleged, the monthly reports for Kansas ask for the name and address of the business to whom the cigarettes are sold. *See* www.ksrevenue.org, *Kansas Wholesale Cigarette Dealer's*

*Monthly Report*, Form CG-8[14], Schedule C, Form CG-16. Before the defendants entered into the conspiracy, they truthfully listed on the reports the actual name and address of the true customers to whom their products were sold. (*James* Tran. 60-64, Gov't Exh. 19-20). This changed after March of 2005.

As detailed in the Government's Response to Doc. 250, Defendant Thomas "Tony" Grantham's *James* Memorandum to Determine the Admissibility of Coconspirator Statements, Section II, Oklahoma requires the ultimate destination be listed on their reports, as does federal law. The names and addresses of the true customers was **not** placed upon the Kansas reports, thus the reports contained false, untruthful information. This furthered the conspiracy in that if the Kansas reports did not match up with those sent to Oklahoma, or with the records required to be kept by the CCTA, the conspiracy to divert cigarettes and defraud Oklahoma would have been uncovered.

(Doc. 293 at 5-6) (emphasis in original).

The government's submission which refers to Docket No. 250 and specifically to Oklahoma's alleged requirement to report "the ultimate destination" of the cigarettes contains the following explanation:

While Oklahoma was aware that smoke shops in higher rate areas were selling exception rate stamped cigarettes, they were not aware of how that was being accomplished, and attempted to learn through audits. (*Franks* Trans. 65-66, 108-110, 119-120,163-165). Defendant Grantham argues that the Oklahoma Tax Commission (OTC) "simply had to have known" about the diversion, thus negating any concealment by the defendants (Doc. 250 at p. 4). The general scheme was widely known, but which wholesalers were knowingly participating and which were not was not widely known (*Franks* Trans. 320-321; Defendant Exh. 16; Government Exh. 4). The Oklahoma Tax Commission (OTC) was not aware that defendant Hall had his own smoke shop which was selling cigarettes without the appropriate stamp (*Franks* Trans. 139-140, 298-310; *James* Trans. 344-345). If Oklahoma had knowledge that the wholesaler was aware of where the cigarettes were ultimately being sold to the consumer, then that would have been in violation of the Oklahoma law

---

[14]Form CG-8 was introduced in evidence as Boyes Exhibit 15. The exhibit purports to be a monthly inventory of cigarettes stamped at DTW. It does not contain any information regarding shipments of cigarettes. The government does not contend that form CG-8 supports its case.

(*Franks* Trans. 111-112).

The OTC conducted audits on wholesalers, including both Sunflower and DTW. (*Franks* Tran. 109, 112-113). The audits of the named defendant corporations showed that Pipestone, through Jeremy Hooker had "purchased ten additional Pipestone accounts using the exceptions rate." (*Franks* Trans. 268; *Franks* Def. Exhibits 1 and 2, Search Warrant Affidavit). It also showed that Sunflower and DTW were invoicing cigarettes to one smoke shop, not listed with OTC as a tribal retailer, while a different smoke shop was paying for the same cigarettes. (*Franks* Tran. 113-115). The retailers being supplied by Sunflower and DTW were concealed by naming them Pipestone PO #1-30 and so on. (*Franks* Def. Exh. 2, Search Warrant Affidavit, Franks Tran. 233; *James* Trans. 47-48, 81-84). The Pipestone PO numbers did not exist before the law changed in 2005. (*James* Trans. 53, 58-63, 64-66, 69-72, 78-85, 91; Statement 26). The PO # 1-30 numbered smoke shops were not on the OTC list of licensed retailers that wholesalers were allowed to sell to. (*Franks* Trans. 115-116, 123). Without the actual names of the smoke shops listed as PO # 1-30, the OTC was not able to accurately track where the cigarettes were ultimately sold to the consumers. (*Franks* Trans. 112-115) This was the destination for which the cigarettes were to be appropriately stamped under Oklahoma law (*Franks* Trans. 86, 111).

* * *

Oklahoma requires wholesalers licensed in their state to sell only to the customers on the OTC list of retail stores (*Franks* Trans. 115-116). The various Pipestone PO #1-30 stores were *not* on that list, and the list was not located nor provided to the OTC in the audits. Thus, material facts were being hidden from authorities by the defendants, including defendant Grantham. (*James* Trans. 78).[15]

* * *

So, while the State of Oklahoma was aware of the general scheme that could occur, the participants and the manner of execution was not open and obvious. That information was affirmatively concealed and hidden from Oklahoma by the way the orders were taken; the way payment was made; the way product was delivered; and by the way the paperwork was handled, maintained, kept and reported.

---

[15]Relevant excerpts from the cited transcripts are produced elsewhere in this memorandum.

* * *

Oklahoma requires wholesalers to provide a Cigarette States Tax Report, and to keep invoices for all sales which OTC can inspect, to show that ultimate address and person at that address that received the cigarettes for resale at a tribal retail store. 68 OSA § 346 (c)(4); OAC § 710: 70-2-12(c). Under federal law, cigarette distributors are required by law to keep records which can be inspected by the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) through its authority with the Attorney General. 27 C.F.R. § 646.153; 18 U.S.C. § 2343. Some of the records to be kept are in subsection (a) (1) -(3) of 18 U.S.C. § 2343 . . . .

(Doc. 301 at 11-13).

Finally, in response to an inquiry by the court, the government further clarified its position, as follows:

The government alleges in Count 1, in addition to other violations of federal law used as the basis of the conspiracy, that the defendants made false statements or representations with respect to records required by Federal law to be kept in Sunflower's and DTW's commercial records under 18 U.S.C. §§ 2342(b) and 2343(a); Title 27, Code of Federal Regulations, §§ 646.143 and 646.147. The actual purchasers of the cigarettes, and the actual addresses to which the cigarettes were destined, were not listed in the commercial records of Sunflower and DTW. The purposeful misrepresentation of who the true purchasers of the cigarette shipments were is the basis of this fraudulent scheme to evade the proper taxes owed to the State of Oklahoma.

Documents that the government claims were part of the fraud are:

1. the invoices of Sunflower and DTW, (*James Hearing,* Exh. 19, 21, 26 and 27);
2. the bills of lading of Rebel Industries, Inc. (Rebel). (*James Hearing,* Exh. 28 and 29);
3. the cover sheets generated by Gawkskey. (*James Hearing,* Exh. 30);[16] and

---

[16]As Noe points out (Doc. 344 at 8), the Gawkskey cover sheets were not records which Sunflower, DTW and Rebel were required to maintain under any interpretation of the statutes and regulations. To the extent they were required to keep the other records, the government has not shown that the records themselves were false; rather they were "false" only if the court accepts the government's

4. the monthly cigarette reports submitted to Kansas as filed by Sunflower and DTW. (*James Hearing,* Exh. 20, 22, 37 and 38).

These documents were all used in conjunction to hide the true destination of where the cigarettes distributed by Sunflower and DTW would be sold to the consumer. These records were also used by Sunflower, DTW and Rebel to purportedly show compliance with the CCTA record keeping requirements.

As listed below, the statutes and regulations specifically state - using the words "destined" and "destination" -that wholesalers, such as Sunflower and DTW, must record in their commercial records the name of the purchaser and the address to which the cigarettes are destined if the purchaser is also considered exempted. If the purchaser is not exempted under the regulations, then the nonexempted purchasers are required to provide additional information, including a signature of the person receiving the cigarettes, the driver's license number of the receiver, the license number of the vehicle used to transport the cigarettes, a declaration as to the purpose of receipt of the cigarettes by the receiver, and a declaration as to the name and address of the principal if the receiver is acting as an agent of another person. 27 C.F.R. § 646.147.

\* \* \*

Sunflower and DTW are distributors and exempted persons as defined in 27 C.F.R. § 646.143(e). They are licensed under Oklahoma law as wholesalers, who in turn are responsible for accounting for and paying the state's cigarette tax per the "pass through" provision. 68 Okla. Stat. Ann. §§ 302 and 305(A).[17] Rebel appears to be exempted under 27 C.F.R. § 646.143(d), but the government submits that the bills of lading were not "proper" since "the street address (including city and state) to which the cigarettes are **destined**" was not listed on the bills of lading. The cigarettes were destined for the various retail smoke shops, but those names and addresses were not on the bills of lading nor on the invoices. Only the name Pipestone with a number were listed, and only to the Vinita, Oklahoma address. (*James* Hearing, Gov. Exhibit 28). However, Pipestone and the purchasers of the cigarettes - the various retail smoke shops - were not exempted. They are

"ultimate destination" arguments, which the court does not for reasons stated elsewhere.

[17]The correct citation appears to be 305A.

not licensed by the state to account for and pay cigarette taxes imposed by Oklahoma.

(Emphasis in original).

* * *

*Kansas Law*

The directions on the Kansas Form CG-16 (Rev. 7-04) require the wholesaler reporting sales to customers outside the state to list the name and address of the business to whom the cigarettes were sold on the form. Based on the plain language of the form, the business to be recorded on the form is the one purchasing the cigarettes from Sunflower and DTW.

Neither the purchaser name nor the address of the business to whom the cigarettes were sold were recorded on the monthly reports to the State of Kansas. As discussed more fully below, Sunflower and DTW also concealed from the State of Kansas to whom they sold the cigarettes by assigning a fictitious name and address to the purchaser.

*Oklahoma Law and term "ultimate destination"*

* * *

The term "destined" was used based upon the wording of the federal CCTA statutes. The term "ultimate" *has been used by the government* to refer to the place where the cigarettes were sold to the consumer, or to the person who consumes the cigarettes, as in "last in a progression or series" and "arrived at as the last result. *See definition*, www.merriam-webster.com/dictionary/ultimate. It is not a legal term, nor a term of art, but rather the plain meaning of the word which is meant to convey that the address of the store which sells to the consumer is the address required by both Oklahoma and federal law. (*Franks* Trans. 111, Testimony of Larry Patton).

(Emphasis supplied).

* * *

Although Oklahoma requires monthly cigarette reports (*Franks* Trans. at 121-122, Testimony of Larry Patton); 68 Okla. Stat. Ann. §§ 301; 312 (B); 316.G [now H] 1), the monthly reports from Sunflower and DTW to Oklahoma were not charged in the mail fraud counts of the indictment. However, Sunflower's and DTW's failure to record the purchaser, and address of the purchaser, in the records required to be kept by the State of Oklahoma, furthered the

conspiracy to defraud the State of Oklahoma out of millions in cigarette taxes.

* * *

The mail fraud violations cited in Counts 8-17 are only in relation to the Kansas cigarette reports mailed by Sunflower and DTW to the State of Kansas. Sunflower and DTW perpetuated the fraudulent scheme by listing Pipestone in Vinita, Oklahoma, as the purchaser of the cigarettes on the reports filed by Sunflower and DTW with the State of Kansas. Sunflower and DTW knew Pipestone was not the purchaser of the cigarettes but they continued to record Pipestone as the purchaser in order to conceal the actual and ultimate destination of the true purchaser. These reports fraudulently listed the same address as did their invoices and other documents to conceal the fraudulent scheme.

The government alleges in Counts 8-17 that the defendants committed mail fraud in furtherance of their conspiracy to evade taxes and defraud the State of Oklahoma. This was done by mailing state monthly cigarette reports to the state tax administrator in Kansas. These reports contained the address and name of Pipestone rather than the actual name and address of each retail store which purchased the cigarettes. This prevented the State of Oklahoma from detecting the actual purchasers and destinations of the cigarettes, thus allowing the defendants to continue to conceal their fraudulent scheme, in violation of Title 18, United States Code, § 1341.

* * *

Pursuant to K.S.A. 79-3316(e), Sunflower and DTW were required to follow the directions and complete the Kansas Form CG-16 (Rev. 7-04) each month. The form requires the wholesaler reporting sales to customers outside the state to list the name and address of the business to whom the cigarettes were sold on the form. Based on the plain language of the form, the business to be recorded on the form is the one purchasing the cigarettes from Sunflower and DTW. By reporting to Kansas what was on the invoices - the Pipestone address - this led Kansas to falsely believe that Pipestone was the actual store where the cigarettes were sold to the consumer. This is how the fraud was being concealed and perpetuated, and it is the basis of the allegations in substantive mail fraud counts 8-17.

(Doc. 343 at 4-25).

Discussion

At the outset, it is important to remember that this is not a "classic" contraband cigarette case involving unstamped cigarettes. In other words, all the cigarettes <u>did</u> <u>bear</u> "evidence of payment" by means of Oklahoma stamps placed on the packages by Sunflower and DTW, both licensed stamping agents. This fact alone distinguishes this case from <u>United States v. Baker</u>, 63 F.3d 1478 (9th Cir. 1995), cited by the government. The cigarettes in <u>Baker</u> were contraband because they bore no stamps ("None of the parties involved in the transactions relevant to [<u>Baker</u>] obtained preapproval for bringing any unstamped cigarettes into the State of Washington." <u>id.</u> at 1483). <u>See</u> <u>also</u>, <u>United States v. Wilbur</u>, No. CR 09-191 MJP, 2010 WL 519735 (W.D. Wash.) which likewise involved a CCTA prosecution for <u>un</u>stamped cigarettes. Instead, insofar as the present motion is concerned, the bottom line dispute seems to boil down to the government's allegation that defendants committed the various violations because they did not report the ultimate destination/purchaser of the stamped cigarettes versus defendants' response that there was no requirement that they do so.

The indictment, although lengthy, is non-specific regarding the reporting requirements of particular statutes and regulations. The four indictment references are as follows:

> 36. As stamping agents for cigarettes to be sold in Oklahoma, SUNFLOWER and DTW were responsible for purchasing rolls of cigarette tax stamps from the State of Oklahoma and affixing the applicable stamp to the packs of cigarettes prior to distribution. SUNFLOWER and DTW purchased the tax stamps in advance and stamped the cigarettes. SUNFLOWER and DTW were also responsible for submitting monthly cigarette reports to the States of

Kansas and Oklahoma,[18] which reported the number of cigarettes sold on specific dates and the location where the cigarettes were *ultimately destined* for retail sales to the consumer.

43. In order to conceal the cigarette diversion scheme, defendants caused the mailing of false monthly cigarette reports filed with the State of Kansas. The false reports concealed the *true destination* of cigarettes transported to various retail locations throughout Oklahoma including cigarettes shipped to and purchased by Shawnee Tobacco which was operated by HALL and managed by DAVIS. Without the filing of the false reports, Defendants SUNFLOWER and DTW would have been required to place the proper stamps on the cigarettes diverted through the exception rate stores which would have reduced the volume of cigarette sales to the various higher tax rate Oklahoma

---

[18]Shipments of cigarettes delivered by Rebel from DTW and Sunflower in Kansas to Pipestone in Vinita, Oklahoma were recorded on Kansas form GC-16 which was also utilized by Oklahoma. <u>James</u> hearing testimony of IRS Agent Tanya Martin, Transcript Doc. 258 at 15-16. There is no evidence that federal authorities dictated or otherwise had any input into the information required on form CG-16.

Boyes Exhibit 16 was introduced at the <u>James</u> hearing by Boyes' counsel as part of his examination of agent Martin. It is dated June 2005. It purports to be a form required by OTC and is entitled "Out of State Consolidated Monthly Cigarette Report." The report consists of several pages showing invoice date, invoice number, the "sold to" names and addresses of buyers of cigarettes in various towns in Oklahoma.

Agent Martin admitted that the information reported on Exhibit 16 was the same as that reported to Kansas, at least insofar as sales to Pipestone #10 were concerned. But she testified that she nevertheless saw the forms as evidence of the "scheme":

Q How is Discount, when they send a report to Kansas, defrauding Oklahoma or concealing information from Oklahoma when they send the same report to Oklahoma?

A The reports that they sent to both Oklahoma and Kansas concealed the scheme. Had they filed an accurate report with Kansas, because they knew that Pipestone number 15 was Gary Hall's leased smoke shop, and put the Harrah, Oklahoma, address on the Kansas form, therefore, providing a true and accurate report filed with Kansas, and Oklahoma got a copy of that report that was filed with Kansas, it would not have matched the Oklahoma report. Therefore, uncovering (sic) the overall conspiracy and concealment of the scheme.

<u>James</u> hearing testimony of IRS Agent Tanya Martin, Transcript Doc. 257 at 34-35.

retail stores.

      71.  Beginning on or about the dates as alleged in each count listed below, in the District of Kansas and elsewhere, defendants, did knowingly, and unlawfully ship, transport, receive, possess, sell, and distribute cigarettes, and failed to maintain the required record keeping related to these sales, to wit: failed to keep records listing the name, address, destination (including street address), vehicle license number, driver's license number, signature of the person receiving such cigarettes, the name of the purchaser, and/or a declaration of the specific purpose of the receipt (personal use, resale, or delivery to another).

      73.  Beginning on or about the dates as alleged in each count listed below, in the District of Kansas and elsewhere, defendants did devise, execute and attempt to execute a scheme and artifice to defraud the State of Oklahoma, and for the purpose of concealing and in furtherance of executing such scheme and artifice to defraud, did knowingly, willfully and unlawfully place and cause to be placed in and affecting interstate commerce in the United States Postal Service, an item, to wit: false monthly cigarette reports to be sent or delivered by the United States Postal Service to the Kansas tax administrator, addressed to: Kansas Department of Revenue, Division of Taxation, 915 SW Harrison Street, Topeka, Kansas 66625-2073:

(Emphasis supplied).

Much of what is alleged in these four paragraphs is either unopposed or supported by evidence admitted at the <u>Franks</u> and <u>James</u> hearings. For example, the allegations in paragraph 36 are generally admitted by defendants except for the words "ultimately destined." As to paragraph 43, the fact that shipments were made is not contested. What <u>is</u> contested is that false reports were filed and that a diversion scheme was carried out. The same is generally true with respect to paragraph 71. The court has found, as a matter of law, that defendants Sunflower, DTW and Rebel were not required to keep records relating to vehicle license numbers, etc. (<u>supra</u>, footnote 6). Finally, as to paragraph 73, agent Martin testified that

the Kansas reports did not contain false information:

Q    And, in fact, Mr. Noe did file routinely each month reports, or the forms required by Kansas law; correct?

A    Yes, that is correct.

Q    Are you familiar with the Kansas law that pertains to the filing of monthly cigarette reports?

A    I'm just familiar that the reports are required.

Q    Have you ever looked at the Kansas law that specifies what needs to be filed on a monthly basis?

A    I've had conversations with the Kansas Department of Revenue.

Q    Let me show you what's been marked as Noe Exhibit 2 if I may. Have you ever seen Noe Exhibit 2 before?[19]

A    I do not believe I have.

Q    And so it's safe to assume that you have never read the Kansas statute that pertains to the filing of cigarette reports on a monthly basis; correct?

A    That is correct.

Q    Do you know what that statute requires by virtue of your conversations with authorities that needs to be disclosed on the monthly cigarette reports?

A    My understanding from conversations with the Department of Revenue in Kansas is that they're required to file the monthly cigarette reports. If they're -- I think it's different if you're licensed in Kansas versus whether you just sell into Kansas; and if you're licensed in Kansas then you're required to report the location of the wholesaler as well as where the cigarettes are being sold, how many stamps are sold within the state or unstamped and still in inventory.  Just from my conversations.

Q    Okay. Looking at Exhibit 2, Subparagraph (e), that specifically states what a wholesale dealer shall report to the director. That's what it says, doesn't it? At the beginning of that subsection?

A    It does.

_____

[19]Exhibit 2 is K.S.A. 79-3316.

-32-

Q    And it says: Should report on or before the 10th day of each month stating the amount of cigarettes sold during the preceding month and the amount of all cigarettes returned to the manufacturer. Correct?

A    Correct.

Q    And then the very last sentence says: Such report shall be made on forms provided by the Director and shall contain such other information as the Director may require. Correct?

A    That is correct.

Q    It's your position in this case, as you've testified, I believe, that the reports filed by Sunflower and Discount were not true and accurate.

A    After March of 2005, yes.

Q    And you used the words that they were not true and accurate; correct?

A    Correct.

Q    And you also testified that they were not true and accurate because the -- because Kansas requires a wholesaler to report the ultimate destination of the cigarettes. You said that several times today and yesterday both; correct?

A    That is correct.

Q    Sometimes you used the word ultimate consumer and sometimes you used the word ultimate destination; correct?

A    Correct.

Q    Can you point me to any written publication or document promulgated by the Department of Revenue or enacted by the State of Kansas which requires that the wholesaler disclose the ultimate destination of cigarettes that are sold?

A    I can point you to a document that shows that it's required to report the destination of where it's sold.

Q    And what document is that?

A    Well, that would be that form that is required that it says such report shall be made on forms provided by the Director and shall contain such other information as the Director may require. I believe that would be the form that

was submitted as the monthly cigarette report.

Q    And you said that form requires the destination of where the product was sold; correct?

A    I don't know exactly what's on the title of it; but it requires you to show where the cigarettes went.

Q    Have you ever looked at the instructions that accompany the form that are given to wholesalers in Kansas?

A    No, I have not.[20]

* * *

Q    And what is the source in the law of Kansas that contains the requirement that you have placed on the reports that they show the ultimate destination of the cigarettes?

A    Where it says enter the business address.

Q    And you read that in your interpretation to mean that must be where the cigarettes ultimately end up to be purchased by a consumer; is that correct?

A    I read that to mean that it is supposed to reflect where the cigarettes -- if the wholesaler knew where they were going, they have the requirement to put it on this form.

Q    So, in other words, you're contending there's something in Kansas law that says if the wholesaler knows cigarettes are going ultimately to some location other than the business to whom they are sold, it must be reported on a report? Isn't that what you're saying?

A    I am saying that they are supposed to report on this report where the cigarettes are sold. That's the only way that the states can track where the cigarettes are going. If they put an incorrect address, just because it's shown on an invoice, the state won't be able to track where the cigarettes are going. That's the purpose of these reports is so the states can keep track of where cigarettes are coming into and out of their state.

Q    Where in the Kansas law does it say the purpose is to show where the cigarettes are going as opposed to where the cigarettes are being sold?

---

[20]The form is CG-16, supra.

-34-

A     That would be a question to be answered by the State of Kansas.

Q     That's your interpretation of Kansas law. Nothing that you can point to in the wording of Kansas law.

A     Correct?

A     That is my understanding of the Kansas law.

Q     But you haven't told me of any basis for that understanding other than your own interpretation that the agents need to be able to track where these ultimately go. Is there any other source?

A     Just from conversations with Kansas that they -- the purpose of these reports is to be able to track where the cigarettes are coming from and where they are going.

Q     And who told you that in those words?

A     I spoke with different people. They wouldn't have said it in exactly those words. I'm paraphrasing.

* * *

Q     My question was, as I recall, was there any source for Mr. Noe or Sunflower to follow in terms of what they should do other than what was written on the instruction sheet or in the statute?

A     I'm not aware of any other training or instructions.

Q     Thank you. Exhibit 37[21] contains accurate invoice dates so far as you are able to determine; correct?

A     That is correct.

Q     And it contains accurate invoice numbers and true invoice numbers so far as you were able to ascertain; correct?

A     That is correct.

Q     And I'll adopt your language. For sold to, at least, the listing reflects the entity that was invoiced and was paid for the cigarette transaction; correct?

A     Yes.

---

[21]Exhibit 37 is form CG-8.

Q    I thought you already agreed to that.

A    That's correct.

Q    And the address is the address of the entity which was invoiced and which paid for the cigarettes; correct?
A    The address is the address shown on the invoice.

Q    And the numbers of packs of 20's and 25's were, so far as you were able to determine, were correct on all of the reports; correct?

A    That is correct.

Q    And the invoice numbers that Mr. Noe used and the dates that he used, so far as you've been able to determine, were always correct. True?

A    The invoice dates, numbers and packs were correct, yes.

Q    There was no effort made to illegally or incorrectly show the nature of each transaction as it relates to the number of cigarettes, the invoice or the person who was purchasing the cigarettes. Correct?

A    Well, I disagree with who was purchasing the cigarettes.

Q    For the reasons you've told me before?

A    Correct.

Q    All right. Now, you've also indicated on direct that Mr. Noe created a way to ensure that the reports submitted to Oklahoma were the same as those submitted to Kansas; correct?

A    I believe that was today on somebody's cross and not redirect; but, yes, I did say that.

Q    Okay. And, in fact, the reports submitted to Oklahoma were in -- were on the same forms that were required by Oklahoma; correct?

A    Correct.

Q    And so far as you were able to determine, they all contained the same specific information as was disclosed to Kansas on the Kansas reports; correct?

A    Correct.

> Q    And so whatever Kansas knew, Oklahoma knew; correct?
>
> A    Based on the reports that were filed, yes, they were the same.

(Doc. 258 at 1-15).

Agent Martin's testimony highlights, with great clarity, a defect which causes the indictment to be unconstitionally vague. Without ever reading the applicable Kansas statute, and without having reviewed form CG-16, Martin conjures an interpretation on the basis of hearsay from unidentified persons that the Kansas forms, although they contain accurate information, are nevertheless fraudulent because they do not reflect the "ultimate destination" of the cigarettes, a requirement she cannot identify or substantiate. Agent Martin's misinterpretation then serves as the foundation for the government's theory of a "scheme" which, in one form or other, is the basis of all the charges in the indictment.

The government appears to rely, as well, on the <u>Franks</u> hearing testimony of Larry Patton, Assistant General Counsel with the Oklahoma Tax Commission. Patton gave the following summary in response to questioning by government counsel:

> Q    And what, -- how did those disputes with the Native American tribes arise? If you know? Just briefly.
>
> A    I think the best summary I can give is that because of the status of various compacts or agreements between the State of Oklahoma and the Native American tribes and nations which are resident in the state, there were at one time a number of rates of taxes agreed to. They went as low as what was then called the exception rate, which was five and three-quarters cents a pack. They went up to as high as the new compact rate which was, I believe -- I forget. I think it's like 81 and a half cents a pack. You had a rate for non-compact tribes and then you also had your undiscounted rate which was a dollar three a pack. Problems resulted because of the fact that -- for competitive advantage purposes. If a Native American retailer could

-37-

acquire cigarettes at the exception rate, tax rate, and then be able to market them with that pricing discount, which was a big advantage over the new compact rate, that that gave a competitive advantage not only against other Native American retailers but also over non-Native American retailers. The State of Oklahoma ended up a big loser on that, as did tribes and nations that were subject to the new compact rate, because $.40 a pack of tax went to the tribe and the other $.40 a pack went to the State of Oklahoma.

Q     The compacts, my understanding is that they are a contract between the executive branch of the tribe and the executive branch of the State of Oklahoma. Is that correct?

A     That's correct.

Q     It's not a Legislative act that's passed by the State of Oklahoma?

A     No. Actually, the entering into the compacts was authorized by legislation by the Oklahoma Legislature and the Governor authorized to enter into this agreement. And I think structurally it had to be that way because taxes come out of the Legislature rather than out of the executive.

Q     Okay. And all the tribes -- strike that. The tribes that entered compacts with the state, because it's my understanding not all of them did, all of those compacts were different in certain respects. Is that correct?

A     Not necessarily; but there certainly were some that were different.

* * *

Prior to January the 1st of 2005, the rate structure in Oklahoma had been somewhat even and we had few categories. When an increase in the taxes was approved by the public, that kicked in *a very complex pricing system* from existing compacts. Throughout 2005 it was observed and believed that the result of this was that there was a large and concerted amount of trafficking in the exception rate six cent stamp cigarettes to principally Native American retailers who were bound to pay the higher rate, which was resulting in a revenue loss not only to the State of Oklahoma of $.40 a pack, but also to compacting tribes who on the new compact rate were entitled to $.40 a pack of the tax revenue themselves. As a result of that, an effort was made to meet the issue the only way in which we had definitive jurisdiction which was through regulation of wholesalers who are licensed by the Oklahoma Tax Commission

pursuant to its statutory authority. Under Oklahoma law, the wholesaler is required to affix the proper stamp to the cigarettes prior to distributing them to a wholesaler. We were of the opinion at that time, and still are, that a wholesaler has an obligation not to shut his eyes to the nature of the transactions in which he engages. So that if a wholesaler receives, for instance, on one day, six different orders from the same retailer, often repeating the amount or brand of cigarettes purchased on a previous order, that that wholesaler is on notice that he may be selling cigarettes to someone at an incorrect rate, which is a violation of his statutory duty.

Audits were commenced in the ordinary course, and after some consideration, what we admitted a few moments ago, Rule 12,[22] was adopted by the Commission as a way of impressing and enforcing upon wholesalers their obligation to police the transactions in which they participated. Beginning in January of '06 we were in litigation almost constantly for some five to six months. First with the -- first with the wholesaler attack upon the rule, which was defeated in district court and ultimately affirmed by the Supreme Court by the Cherokee retailers suit in Maize County which has been discussed here, by another retailer suit in Osage County which has not been discussed here, by a suit by the Osage Nation in Federal Court which resulted in an order to arbitration with that Nation, by arbitration with the Cherokee Nation which was instituted pursuant to that compact, by a second suit by the Osage Nation which simply resulted in that arbitration being slightly expanded in scope. And at the end of that period, basically, Your Honor, because of the importance of the issues and the fact that the compacts were the basis of rights, all the involved courts, generally speaking, stood down to await the results of the arbitration itself. The arbitration continued considerably longer than had been anticipated and actually I don't -- no, I don't think it was concluded by the date in '07 because the Cherokee arbitration was concluded in favor of the State of Oklahoma, ruling that the retail-to-retail sales violated the compact. A similar decision was made in the Osage arbitration. And in both cases this resulted in a new compact being entered into between the State of Oklahoma and the tribe. And in the case of the Osage Nation, I think that was like December of '08.

Q     Okay. And so ultimately your position, Oklahoma Tax Commission's position, that what was going on was statutorily in violation of the law, that was ultimately upheld in arbitration?

---

[22]Rule 12 appears to be OAC 710:70-2-12.

A    Actually my answer is that the determination was that under the compacts there was no right for the retail-to-retail.

BY MS. FURST:

Q    Okay. And what was the law in effect at that time about stamping cigarettes?

A    Oh, that, that law was and is unchanged. That's 6801 Section 302, and that places an obligation on the wholesaler to affix what we say is clear under the statute the proper stamp to cigarettes being sold.

Q    And the proper stamp under the statutory scheme in Oklahoma is the stamp for the place where that cigarette package is going to be sold to the ultimate consumer?

A    Yes. That's what the contemplation of the compacts is, that the rate is at the point where the consumer receives it.

Q    So if a wholesaler stamps a load of cigarettes with the exception rate six cent stamp, they're sent down to Pipestone, which I think you testified was an exception rate store, and then other retailers show up, load their trucks, go back to their higher rate stores and then sell from the high rate stores to consumers, is that something that you saw as the Oklahoma Tax Commission as being in violation of the law?

A    If the wholesaler has constructive knowledge that that's the result, that's in violation of the Oklahoma law.

Q    And if the wholesaler does not know that's happening then you can't hold him accountable?

A    That's correct.

(Doc. 253 at 15-19) (emphasis supplied).

According to Patton, the practical effect, the intent, of OAC 710:70-2-12 ". . . was to control the number of packs of cigarettes at a certain tax rate that a wholesaler over which we had jurisdiction could sell . . ." because the OTC had no jurisdiction over tribal retailers. This, in turn, related to the "retail-to-retail" sales controversy which has been covered in other orders. Under questioning

-40-

by government counsel, Diane Hammons, Attorney General for the Cherokee Nation, testified:

> Q     Okay.    So was it fair to say that the state of interpretation of tribe retail-to-retail was up in the air during this period of time in '05, '06?
>
> A     We believed it to be.

(Doc. 253 at 102).

This testimony does not save the indictment. On the contrary it and the other evidence produced at the <u>Franks</u> and <u>James</u> hearings confirms what has never been in dispute: that Oklahoma's laws and regulations during the relevant period were, as Patton described, "a very complex pricing system" which was the subject of litigation. Retail-to-retail sales were not a secret. They were wide-spread and the subject of many news reports.

So, the court returns to the beginning. The indictment does not charge, nor does the evidence produced by the government demonstrate, a "classic" CCTA unstamped cigarette case. The cigarettes were stamped and records were made and maintained. CCTA violations are derived from state records. The Kansas records were accurate and they were utilized by Oklahoma. To the extent Oklahoma records were prepared, they were accurate, as well. The crimes charged are founded not upon facially-false entries on records but instead upon the government's and its case agent's opinion regarding what the records <u>should have</u> shown: the "ultimate destination" of the cigarettes.

First, such language was nowhere in any federal, Kansas or Oklahoma statute or regulation during the relevant period. If it was a requirement during the relevant period, then why was it necessary in 2010 to amend the Oklahoma statute to include the word

-41-

"ultimately"? Second, and even more telling (and this is especially troubling to the court) is the government's admission it has decided the term "destination" really means "ultimate destination"; in other words, to the "place where the cigarettes were sold to the consumer" by its use of a dictionary definition. This is an approach which the court has never before encountered. The illogic of this approach is that even if the court should allow a jury to hear the opinions of agent Martin (and the government has never cited any authority for the proposition that they are admissible), the court then ought to instruct the jury on the government's interpretation of a statute by inserting a dictionary definition. The end result of all this is and would be, the "standardless sweep" which is prohibited by the law cited at the outset of this memorandum.

## Conclusion

Dismissal of an indictment is discretionary. <u>United States v. Hedges</u>, 458 F.2d 188, 191 (10th Cir. 1972). After much consideration, the court concludes that defendants have met their substantial burden to demonstrate that the indictment, in its present form, is unconstitutionally vague as applied and therefore is subject to dismissal. This does not necessarily end the case, of course. The government may appeal or it may seek another indictment. However, a motion for reconsideration of this order is strongly discouraged. "Rarely do parties in criminal proceedings file motions to reconsider rulings on pretrial motions." <u>United States v. D'Armond</u>, 80 F. Supp. 2d 1157, 1170 (D. Kan. 1999). Motions for reconsideration are not provided for by the Federal Rules of Criminal Procedure or Appellate Procedure. <u>United States v. Schweibinz</u>, No. 93-40001-06-SAC, 1994 WL

129998, *1 (D. Kan. Mar. 15, 1994) (recognizing that "courts have created a common-law exception recognizing 'motions to reconsider' in criminal cases under ... United States v. Healy, 376 U.S. 75 (1964)). Hopefully it is obvious that the court has made every effort to consider all aspects of the issues and that further consideration will not be consistent with Fed. R. Crim. P. 2.

The motion is granted and the indictment is dismissed, without prejudice.

IT IS SO ORDERED.

Dated this ___10th___ day of December 2010, at Wichita, Kansas.


                                    s/ Monti Belot
                                    Monti L. Belot
                                    UNITED STATES DISTRICT JUDGE